# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br><br>vs.<br><br>ERIC DEANGELO GRIGGS, a/k/a "E",<br>Defendant. | Case No. 19-cr-2062-CJW<br><br>**REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION TO SUPPRESS**<br><br>**Filed Under Seal** |

_____

## TABLE OF CONTENTS

Page

I.    *INTRODUCTION*................................................................**3**

II.   *FINDINGS OF FACT*........................................................**4**

III.  *DISCUSSION*..................................................................**7**

    A.   *The Parties' Argument* ...............................................**8**

    B.   *Whether Defendant has Standing Under the Fourth Amendment to Seek Suppression of the September 1 Text Messages on Ms. Wilder's Cell Phone* ..............................................................**9**

    C.   *Whether the Act Requires Suppression of Evidence Obtained by Law Enforcement's Use of Ms. Wilder's Phone*.................................**14**

        1.   *Whether Defendant has Standing Under the Act*...................**15**

            a.   *Whether Defendant is an Aggrieved Person* .................**15**

            b.   *Whether Defendant's Text Messages were Intercepted* .......................................................**17**

1

*c.      Conclusion* ......................................................**20**

*2.      Whether Investigator Berry's Conduct Fell Within the Act's Exception for Persons Acting Under "Color of Law"* .............**20**

*3.      Whether Defendant is entitled to Suppression of Evidence Under the Act* ...............................................................**26**

*4.      Recommendation* ......................................................**27**

*D.      Whether Officers' Approach of Mr. Scaturro's Vehicle, Seizure of Defendant, Seizure of Defendant's Cell Phone, and Arrest of Defendant Violated the Fourth Amendment* ................................................**27**

*1.      Whether Officers had Reasonable Suspicion to Approach Mr. Scaturro's Vehicle* ...............................................**27**

*2.      Whether the Investigatory Stop and Initial Seizure of Defendant was Conducted in a Manner Reasonably Related in Scope to the Circumstances that Justified the Stop* ................................**34**

*3.      Whether the Immediate Seizure of Defendant's Cell Phone was Justified* ...............................................................**36**

*4.      Whether there was Probable Cause to Arrest Defendant* .........**38**

*5.      Recommendation* ......................................................**39**

*E.      Whether Evidence must be Suppressed as Fruit of the Poisonous Tree* ...........................................................................**39**

*1.      Whether the Contents of Defendant's Cell Phone must be Suppressed* ...............................................................**39**

*a.      Whether Defendant has Made a Substantial Preliminary Showing he is Entitled to a* Franks *Hearing* ...............**40**

*i.      Legal Standard* ..........................................**41**

2

ii. *Whether Investigator Berry Acted Deliberately or with Reckless Disregard for the Truth* ......................**42**

iii. *Whether Omitting the False Information Would Have Altered Probable Cause* ..................................**44**

b. *Whether the* **Leon** *Good Faith Exception Applies to the Warrant* ...........................................................**46**

c. *Whether the Warrant is Supported by Probable Cause Under a* **Swope** *Analysis* ..................................................**51**

2. *Whether Statements Made at the Waterloo Police Department Should be Suppressed* ....................................................**54**

a. *Temporal Proximity* ...............................................**57**

b. *Intervening Circumstances* ......................................**58**

c. *Purpose and Flagrancy of the Official Misconduct* ........**58**

d. **Miranda** *Warnings* ...............................................**59**

e. *Conclusion* .........................................................**62**

IV. *CONCLUSION* .........................................................**62**

## I. INTRODUCTION

The matter before the Court is Defendant's Motion to Suppress. (Doc. 25.) The Government timely filed a response. (Doc. 34.) The Honorable Charles J. Williams, United States District Court Judge, referred the motion to me for a Report and Recommendation.

On September 25, 2019, the Grand Jury charged Defendant with one count of Distribution of a Controlled Substance Resulting in Death in violation of 21 U.S.C. Section 841(a)(1), one count of Possession with Intent to Distribute and Aiding and Abetting the Possession with Intent to Distribute a Controlled Substance in violation of 21 U.S.C. Section 841 U.S.C. Section 841(a)(1) and 18 U.S.C. Section 2, and two counts of Use of a Communications Facility to Facilitate a Felony Drug Offense in violation of 21 U.S.C. Section 843(b). (Doc. 2.) The charges arose from the heroin overdose death of Abigail Wilder on August 31 or September 1, 2018.

I held a hearing on Wednesday, July 29, 2020. (Doc. 38.) Waterloo Iowa Police Investigator Nicholas Berry testified for the Government. Investigator Berry has been an officer with the City of Waterloo since 2004, is assigned to the Tri-County Drug Enforcement Task Force ("the task force"), and is a task force officer with the FBI. Defendant called no witnesses. The Government's Exhibits 1-5 and Defense Exhibits A-D were admitted without objection. (*Id.* at 2.) At the hearing, Defendant made an oral motion for a hearing under *Franks v. Delaware,* 438 U.S. 154 (1978). For the following reasons, I respectfully recommend that the District Court **deny** Defendant's Motion to Suppress.[1] I also recommend that the District Court **deny** Defendant's oral motion for a *Franks* hearing.

## II.    FINDINGS OF FACT

On the evening of August 31, 2018 ("August 31"), Abigail Wilder talked to her boyfriend Jeffrey Schmitt on the phone four times, the last time at 8:55 p.m. Mr. Schmitt was incarcerated in the Black Hawk County Jail and their calls were recorded on the Black Hawk County Jail recording system.

---

[1] If the District Court does not agree with some of my findings, then, as will be discussed, I recommend the Court grant in part and deny in part Defendant's Motion to Suppress.

During an 8:04 p.m. phone call, Ms. Wilder told Mr. Schmitt that she was driving to Dewar, Iowa to "get it" and to pick up her supplier. (Doc. 26-1 at 13.) She then took her supplier back to a house in Waterloo, Iowa. During an 8:38 p.m. call, Ms. Wilder told Mr. Schmitt that she had just dropped off her supplier and was returning home. Ms. Wilder spoke to Mr. Schmitt for the final time at approximately 8:55 p.m. as she was arriving home. Mr. Schmitt asked what took her so long, and Ms. Wilder said her supplier "had to sell to someone else so I had to stay in the car" and then drive her supplier to the east side of town. (*Id.* at 14.) Mr. Schmitt cautioned Ms. Wilder to "be safe[.] I've been worried you can always do more. . . . I'm talking about the H[;] don't do too much at one time." (*Id.*)

Ms. Wilder went into the basement of the home she and Mr. Schmitt shared with Mr. Schmitt's mother, used the heroin she had just purchased from her supplier, and died.

On September 1, 2018 ("September 1"), Cedar Falls police were called to the home where Ms. Wilder had been found dead with a spoon and some heroin on a night stand next to her body and an uncapped syringe and pink iPhone in plain view.[2] Ms. Wilder had lived in the basement of the residence with Mr. Schmitt. Kara Schmitt, Mr. Schmitt's mother, lived upstairs of the residence. The Waterloo Police Department was contacted and Investigator Nicholas Berry and Investigator Isley responded. Investigator Berry obtained a search warrant for Ms. Wilder's cell phone, among other things. (Doc. 34-1.) At about the time Investigator Berry obtained the search warrant, Investigator Isley went to speak to Mr. Schmitt at the jail and Mr. Schmitt gave Investigator Isley the code to unlock Ms. Wilder's cell phone. The phone was unlocked in Mr. Schmitt's presence.

---

[2] All the following facts were obtained from the July 29, 2020 hearing testimony of Waterloo, Iowa Police Investigator Nicholas Berry, unless otherwise noted. (Doc. 46.)

During his interview with Mr. Schmitt, Investigator Isley learned that Ms. Wilder would communicate with her heroin supplier via Facebook Messenger and text messages. Mr. Schmitt also told Investigator Isley that he did not know the name of Ms. Wilder's supplier, but he was a "skinny black male" and would "probably be the last person that Abigail spoke to on Facebook messenger, as that is how she usually contacted him." (Doc. 26-1 at 1.)

When Investigator Berry searched Ms. Wilder's phone pursuant to the warrant, he found "drug-related communications" between her Facebook Messenger account and a Facebook Messenger account associated with the name "Eric Griggs." (Doc. 34-2; Doc. 46 at 13.) Both Investigator Isley and Investigator Berry had worked on the task force for years and the name "Eric Griggs" had come up before in their work. Investigator Berry testified that he believed he and Investigator Isley looked at Defendant's Facebook page associated with his Messenger account and at photos of Defendant. (Doc. 46 at 12.)

Ms. Wilder would also text Defendant and make audio calls to Defendant. It also became apparent to law enforcement that text messages, messages exchanged between Ms. Wilder's Messenger account and Defendant's Messenger account on the last day Ms. Wilder was alive "kind of coincided with" Ms. Wilder "meeting with [Defendant] to obtain narcotics." (*Id.* at 14.)

Shortly after 4:00 p.m. on September 1, Investigator Berry began using Ms. Wilder's phone to send text messages and Facebook Messenger messages to Defendant in an undercover capacity. He reached out to Defendant on both platforms and tried to replicate the situation that occurred the previous night when he suspected Ms. Wilder purchased heroin from Defendant. Defendant responded to text messages and that is the form of communication Investigator Berry used with Defendant from then on. Ultimately, Defendant agreed to deliver heroin to Investigator Berry apparently believing he was Ms. Wilder. Investigator Berry testified that he believed Defendant's intentions

6

were to supply Ms. Wilder with heroin. Investigator Berry set up a situation in which "Ms. Wilder" would be eating at a Perkins restaurant with her mother and then Defendant would pick her up. At 4:35 p.m., Defendant texted Investigator Berry that he was at the Casey's gas station directly adjacent to the Perkins. Investigator Isley was in the Casey's lot at the time and observed a white Ford Explorer arrive in the lot. The text message Defendant sent coincided with the arrival of the Explorer. In addition, Investigator Isley identified a person he believed was Defendant in the passenger seat of the Explorer. The Explorer drove into the Perkins parking lot and parked.

At that point, marked patrol units from the Waterloo Police Department approached the Explorer. (Gov. Exs. 4, 5.) Defendant, who had his cell phone in his hand, was asked to step out of the vehicle and he complied. Both Defendant and Joseph Scaturro, who was driving, were detained and handcuffed. Defendant was immediately *Mirandized* and searched. (Gov. Ex. 5 at 1:21-2:59.) Defendant stated that he understood his rights. (*Id.* at 1:49.) Mr. Scaturro was also searched. (*Id.* at 6:00.) Both Defendant's and Mr. Scaturro's cell phones were seized. Law enforcement eventually obtained a warrant to search Defendant's cell phone. During the stop, Defendant gave consent to an officer to go into his phone and find the phone number for the mother of his son, who was in the backseat of the Explorer at the time.

Defendant eventually admitted he was in the Perkins lot to meet Ms. Wilder, but said he was there to have sex with her. The Explorer belonged to Mr. Scaturro, who gave officers permission to search the vehicle. Inside the Explorer, officers found a plastic baggie with a substance later identified as heroin and a syringe with a cap on it. Other facts and testimony will be introduced when relevant to the following discussion.

### III. DISCUSSION

Defendant argues that law enforcement's text communications with him on September 1 were "akin to an illegal wiretap and should be suppressed." (Doc. 26 at 3-

7; Doc. 40 at 1-9.)  Defendant also argues that the stop and search of Mr. Scaturro's vehicle and subsequent seizure of Defendant violated the Fourth Amendment.  (Doc. 26 at 7-13.)  Defendant further asserts that statements he made at the Waterloo Police Department and information in his cell phone are fruits of the poisonous tree and must be suppressed.  (*Id.* at 13-17.)  As part of this argument, Defendant touched on the issue he raised in his separate oral motion at the hearing, which is that he is entitled to a hearing under *Franks v. Delaware,* 438 U.S. 154 (1978).

*A.    The Parties' Arguments*

Defendant argues that the text messages between he and Investigator Berry while Investigator Berry pretended to be Ms. Wilder were "akin to a wiretap, and law enforcement should have obtained authorization for the inception.    Because law enforcement did not do so, suppression of the communications is warranted" for several reasons: 1) Defendant asserts he has standing under the Act to seek suppression of evidence seized in violation of the Act's prohibition on wireless interceptions; 2) he had a reasonable expectation of privacy in the text messages he exchanged with Investigator Berry thinking he was texting with Ms. Wilder; 3) his text messages were "intercepted" within the meaning of the Act; and 4) Investigator Berry's conduct did not fall within the Act's exception for persons acting under "color of law."  The Government responds that law enforcement's use of Ms. Wilder's cell phone did not impact Defendant's privacy interests because 1) Defendant lacks standing to challenge the search of Ms. Wilder's cell phone; 2) Defendant had no reasonable expectation of privacy in Ms. Wilder's cell phone; 3) Defendant had no reasonable expectation of privacy in the text messages he sent to Ms. Wilder; 4) Investigator Berry's use of Ms. Wilder's cell phone was not an illegal wiretap in violation of the Act; and 5) Defendant's messages were not "intercepted" within the meaning of the Act.

8

**B.      Whether Defendant has Standing Under the Fourth Amendment to Seek Suppression of the September 1 Text Messages on Ms. Wilder's Cell Phone**

Defendant asserts that he has standing to seek suppression of the text messages he exchanged with Investigator Berry when he thought he was texting with Ms. Wilder. The Government counters that Defendant does not have standing to seek suppression. The parties argue that different bodies of law control the issue. The Government argues that Defendant's argument fails under a traditional Fourth Amendment standing analysis. Defendant, on the other hand, argues that the Wiretap Act confers standing on anyone who meets the definition of an "aggrieved person" under the Act.

"The Fourth Amendment protects against unreasonable searches and seizures, but its protections are personal and cannot be asserted by persons lacking a legitimate expectation of privacy in the place searched." *United States v. Kuenstler,* 325 F.3d 1015, 1020 (8th Cir. 2003) (quotation omitted).

> Fourth Amendment rights are personal and cannot be asserted vicariously. *See United States v. Gomez*, 16 F.3d 254, 256 (8th Cir. 1999). A defendant who fails to prove a sufficiently close connection to the relevant places or objects searched . . . has no standing to claim that they were searched or seized illegally." *Id*. A defendant moving to suppress evidence has the burden of showing a legitimate expectation of privacy in the area searched. *See id*. "Factors relevant to the determination of standing include: ownership, possession and/or control of the area searched or item seized; historical use of the property or item; ability to regulate access; the totality of the circumstances surrounding the search; the existence or nonexistence of a subjective anticipation of privacy; and the objective reasonableness of the expectation of privacy considering the specific facts of the case." *Id*.

*United States v. Pierson*, 219 F.3d 803, 806 (8th Cir. 2000) (ellipses in original).

In the Eighth Circuit, a defendant cannot challenge the search of a cell phone belonging to another person if he cannot establish he "owned, possessed, or used . . . [the] cell phone[]. . . [or] describe any other legitimate expectation of privacy" in the

phone. *United States v. Turner*, 781 F.3d 374, 382 (8th Cir. 2015) (holding defendant did not have standing to challenge validity of warrants for co-conspirator's cell phones); *see also United States v. Stringer*, 739 F.3d 391, 396 (8th Cir. 2014) (defendant had no reasonable expectation of privacy in cell phone belonging to third party and therefore could not challenge seizure of photographs on phone, some of which included him).

Both parties cite *United States v. Bereznak*, No. 3:18-CR-39, 2018 WL 1993904, (M.D. Pa. Apr. 27, 2018), *appeal dismissed*, No. 18-2015, 2018 WL 5778228 (3d Cir. Oct. 10, 2018). In *Bereznak*, the defendant sought to suppress text messages on AG's cell phone after her death. *Id.* at *2. He argued that his own Fourth Amendment rights were violated by the search because he had a "reasonable expectation of privacy" in text messages he sent AG "since he expected that only [she] would read them." *Id.* at *3. *Bereznak* held that by sending the text messages to AG, the defendant "assumed the risk that she would reveal the messages or their contents to others. Having assumed this risk, [the defendant could not] now claim that he ha[d] a reasonable expectation of privacy in the content of the messages stored on [her] phone." *Id.* Although *Bereznak* acknowledged that cell phones often contain more intimate information than is revealed by a simple list of incoming and outgoing calls, it reasoned that there is "general agreement there is no reasonable expectation of privacy in electronic content such as emails or pager messages once they are on a recipient's device." *Id.* (citing *United States v. Heckenkamp*, 482 F.3d 1142, 1146 (9th Cir. 2007); *United States v. Jones*, 149 Fed. Appx. 954, 959 (11th Cir. 2005); *Guest v. Leis*, 255 F.3d 325, 333 (6th Cir. 2001); *Smith v. Maryland*, 442 U.S. 735, 743-44 (1979) ("The Supreme Court 'consistently has held that a person has no legitimate expectation of privacy in information he voluntarily turns over to third parties.'"); *United States v. Miller*, 425 U.S. 435, 443 (1976) (a defendant "takes the risk, in revealing his affairs to another, that the information will be conveyed by that person to the Government")). *See also United States v. Maxwell*, 45

10

M.J. 406, 418 (C.A.A.F. 1996) ("[O]nce the transmissions are received by another person, the transmitter no longer controls [an email's] destiny.").

Defendant argues that his case can be distinguished from *Bereznak* because he does not challenge the communications that were on Ms. Wilder's phone at the time of her death. Rather, he only seeks suppression of the September 1 communications between himself and Investigator Berry. Under the reasoning of *Bereznak*, Defendant clearly assumed the risk that the recipient of his text messages, whether it was Ms. Wilder, Investigator Berry, or someone else, would share the messages with the Government.

Defendant argues:

> So too, as relevant here, one has a reasonable expectation that the person with whom one is texting has not died since the last time one met her in person, and one has a reasonable expectation that, in the meantime, a cadre of state narcotics officers have not decided to impersonate her using her phone in an elaborate multi-car sting operation. In short, one has the reasonable expectation when one texts with a friend that the friend has not been died and replaced, secretly, by the police.

(Doc. 40 at 7.)

I respectfully disagree with Defendant's contention on this point. Defendant confuses the reasonable expectation of privacy society is prepared to recognize in text messages with the somewhat unlikely manner they were revealed to law enforcement in this case. First, as *Miller* noted, a defendant "takes the risk, in revealing his affairs to another, that the information will be conveyed by that person to the Government." 425 U.S. at 443. Sending messages by text, as opposed to telephone, video teleconference, or in-person meeting, may be convenient, but it is risky in terms of maintaining the security of the communications. Any means of communications entails the risk that one of the participants will reveal the information to law enforcement. However, text messaging further relies on a participant's commitment to some level of operational security such as password protecting a phone or not sharing access to the phone with

11

others.  Text messaging also does not permit a participant to readily verify the identity of the other participant by recognizing a face or voice.  Second, the manner law enforcement became aware of messages (and were then able to use the phone) may be somewhat serendipitous, but it is not wholly outside the realm of risk everyone takes when they send text messages, i.e., that someone other than the intended recipient would see the texts and even respond to them.  In the context of this case, where Defendant is alleged to have arranged heroin sales by text messages, the risk of law enforcement obtaining access to a heroin user's phone following an overdose is far from negligible.

Moreover, *United States v. Mack* addressed facts similar to the facts of the case at bar and held that the defendant did not have a right to privacy in his text messages. 53 F. Supp. 3d 179, 185-86 (D.D.C. 2014).  In *Mack*, undercover police officers reached out to a drug dealer named Jimmy via text message to purchase PCP.  *Id.* at 184.  The defendant responded to the text instead of Jimmy and sold PCP to the undercover officers. *Id.*  The officers and the defendant then arranged a second purchase via text message. *Id.*  The defendant was indicted for distribution of PCP.  *Id.*  *Mack* held that the defendant's voluntary exchanges of text messages with the undercover officers were not searches or seizures subject to the protections of the Fourth Amendment. *Id.* at 185-86 ("The Defendant did not have a legitimate expectation of privacy in the messages he willingly, and without undue Government prompting, sent to the undercover officers.").

In both this case and *Mack*, the party selling the drugs responded to a request from investigators.  Government's Exhibit 3, which is a transcript of the text message exchange between Defendant and Investigator Berry, shows that Defendant participated "without undue Government prompting."  (Doc. 34-3.)

    Inv. Berry:    "Hi"
    Inv. Berry:    "Wya"
    Eric Griggs:  "Wassup"
    Inv. Berry:    "Need same as yesterday having a bad day"

| | |
|---|---|
| Inv. Berry: | "No wheels" |
| Eric Griggs: | "Answer" |
| Inv. Berry: | "No" |
| Inv. Berry: | "I'm having a terrible day" |
| Inv. Berry: | "Migraine" |
| Eric Griggs: | "Answer the pgine" |
| Eric Griggs: | "Phone" |
| Inv. Berry: | "Cum c me" |
| Eric Griggs: | "Answer" |
| Eric Griggs: | "The phone" |
| Inv. Berry: | "I said I fucking can't" |
| Eric Griggs: | "So how t. F I'm go cuz to u" |
| Inv. Berry: | "W my mom and she is being a bitch" |
| Inv. Berry: | "Pick me up I will have her drop me off" |
| Eric Griggs: | "Cum" |
| Eric Griggs: | "So what do u want me to do" |
| Inv. Berry: | "At Casey's or something" |
| Eric Griggs: | "Go now" |
| Eric Griggs: | "What Casey's" |

(*Id.* at 1-2.)

Although Defendant asked Ms. Wilder to speak on the phone, when she explained that she was with her mother, he immediately said, "Cum[.]  So what do u want me to do[?]  When Investigator Berry responded, "At Casey's or something," Defendant responded, "Go now.  What Casey's[?]"  (*Id.* at 2.)  Ms. Wilder told Defendant she was with her mother and wanted to be picked up at 4:12 p.m.  Defendant said, "Cum," at 4:13 and the parties arranged to meet at Casey's during the next few seconds because the rest of the text messages were all exchanged at 4:13 p.m.  This does not indicate prompting, but rather indicates Defendant's willingness to sell Ms. Wilder the heroin she was asking for.  Therefore, I find that Defendant did not have a right to privacy in the text messages he exchanged with Investigator Berry.

13

I recommend the District Court find that under a traditional Fourth Amendment standing analysis, Defendant does not have standing to seek suppression of the text messages he exchanged with Investigator Berry on September 1, 2018.

## C. Whether the Act Requires Suppression of Evidence Obtained by Law Enforcement's Use of Ms. Wilder's Phone

> Title III of the Omnibus Crime Control and Safe Streets Act of 1968 provides a comprehensive statutory scheme that governs the interception of wire, oral, and electronic communications. *United States v. Oliva*, 705 F.3d 390, 393 (9th Cir. 2012); *see* 18 U.S.C. §§ 2510–22. It establishes "special safeguards against the unique problems posed by misuse of wiretapping and electronic surveillance" over and above Fourth Amendment protections. *United States v. Calandra*, 414 U.S. 338, 355 n.11, 94 S. Ct. 613, 38 L.Ed.2d 561 (1974).

*United States v. Giraudo*, 225 F. Supp. 3d 1078, 1080–81 (N.D. Cal. 2016).

"In 1986, Congress passed the Electronic Communications Privacy Act . . . 'to afford privacy protection to electronic communications' by amending Title III to the Omnibus Crime Control and Safe Streets Act of 1968 (also known as the federal Wiretap Act), which up to that point had only provided statutory protection to land-line 'wire and oral communications.'" *Quon v. Arch Wireless Operating Co.,* 445 F. Supp. 2d 1116, 1128 (C.D. Cal. 2006) (quoting *Konop v. Hawaiian Airlines, Inc.,* 302 F.3d 868, 874 (9th Cir. 2002)), *aff'd in part, rev'd in part on other grounds*, 529 F.3d 892 (9th Cir. 2008), *rev'd on other grounds & remanded sub nom. City of Ontario v. Quon*, 560 U.S. 746 (2010).

The Wiretap Act ("the Act") applies to the interception of wire, oral, or electronic communications. 18 U.S.C. § 2511. "Intercept[ion]" is "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." *Id.* § 2510(4). An "electronic communication"

14

is the "transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted [by various means]," excluding wire communications. *Id.* § 2510(12).

### 1.   Whether Defendant has Standing Under the Act

To have standing under the Act, Defendant must have been both 1) "an aggrieved person" under the Act and 2) the text messages he exchanged with Investigator Berry on September 1 must have been "intercepted" under the Act.

### a.   Whether Defendant is an Aggrieved Person

I find that even if Defendant has standing as an aggrieved person, the Act does not provide for suppression of electronic communications.  "When information is obtained in violation of [the Act], 'no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial.'. . . But only an 'aggrieved person . . . may move to suppress' a communication that was 'unlawfully intercepted.'" *United States v. Chaidez-Ontiveros*, No. 1:11-CR-0264-AT-JFK, 2011 WL 7574634, at *5 (N.D. Ga. Oct. 25, 2011) (quoting *United States v. Faulkner*, 439 F.3d 1221, 1223 (10th Cir. 2006)), *R. & R. adopted*, 2012 WL 984269 (N.D. Ga. Mar. 21, 2012). Under the Act, an "'aggrieved person' means a person who was a party to any intercepted wire, oral, or electronic communication or a person against whom the interception was directed." 18 U.S.C. § 2510(11).

> Any aggrieved person in any trial, hearing, or proceeding in or before any court, department, officer, agency, regulatory body, or other authority of the United States, a State, or a political subdivision thereof, may move to suppress the contents of *any wire or oral communication* intercepted pursuant to this chapter, or evidence derived therefrom, on the grounds that--
>> (i)    the communication was unlawfully intercepted;
>> (ii)   the order of authorization or approval under which it was intercepted is insufficient on its face; or

> (iii)   the interception was not made in conformity with the order of authorization or approval.

*Id.* § 2518(10)(a) (emphasis added).

The parties seem to agree that text messages constitute "electronic communications" within the meaning of the Act.[3]  *See Thompson v. Platt*, 815 F. App'x 227, 230 n.3 (10th Cir. 2020) (citations omitted); *United States v. Banks*, No. 5:13-CR-40060-DDC, 2014 WL 4261344, at *2 (D. Kan. Aug. 29, 2014) ("[T]ext messages constitute 'electronic communication' and not 'wire communication' because they involve no 'aural transfer.'"); *United States v. Jones*, 451 F. Supp. 2d 71, 75 (D.D.C. 2006), *aff'd in part & rev'd in part on other grounds sub nom., United States v. Maynard*, 615 F.3d 544 (D.C. Cir. 2010), *aff'd in part & rev'd in part sub nom., United States v. Jones*, 565 U.S. 400 (2012).  *But see United States v. Steiger*, 318 F.3d 1039, 1050 (11th Cir. 2003) ("Despite the fact that the ECPA amended numerous sections of the Wiretap Act to include "electronic communications," the ECPA did not amend § 2515. . . . Congress considered amending § 2515 in the USA Patriot Act to "extend[ ] the statutory exclusion rule in 18 U.S.C. § 2515 to electronic communications," [but] the Act was passed without such an amendment.") (first set of brackets in original); *United States v. Rice*, 716 F. App'x 121, 123 (3d Cir. 2017) (same); *United States v. Apodaca*, 287 F. Supp. 3d 21, 31 (D.D.C. 2017) ("While not altering the scope of the exclusion remedy, which continues to be limited to improper interception of wire and oral communications, *see* 18 U.S.C. § 2515, ECPA did amend other provisions of Title III to encompass 'electronic communications.'"); *United States v. Meriwether*, 917 F.2d 955, 960 (6th Cir. 1990).

---

[3] There appears to be some disjunction between the statutory language identifying aggrieved persons and scope of the suppression remedy afforded.  In other words, a party may be aggrieved by the interception of an electronic communication, but the Act does not expressly provide for suppression of those communications.

Thus, although Defendant is arguably an aggrieved person, if his text messages were not "intercepted" within the meaning to the Act, he does not have standing.

### b. Whether Defendant's Text Messages were Intercepted

[I]t is not unlawful to intercept such a communication if a party to the communication has given prior consent to the interception. 18 U.S.C. § 2511(2)(c) (2000). Nor does such an interception violate the Fourth Amendment. *United States v. White*, 401 U.S. 745, 753, 91 S. Ct. 1122, 28 L. Ed. 2d 453 (1971).

*United States v. Corona-Chavez*, 328 F.3d 974, 978 (8th Cir. 2003). It is well settled that a law enforcement officer may record conversations to which he is a party without obtaining a warrant. *See United States v. Sileven*, 985 F.2d 962, 966 (8th Cir. 1993) (citations omitted); *United States v. Rosberg*, No. 8:12CR271, 2013 WL 1797280, at *1 (D. Neb. Apr. 29, 2013) (same). This rule applies even when law enforcement acts in an undercover capacity. *See Sileven*, 985 F.2d at 966. Thus, "[a]bsent an agreement to the contrary, [parties have] no reasonable expectation that [others will] maintain the private nature of their text messages, or vice versa." *Quon v. Arch Wireless Operating Co., Inc.*, 529 F.3d 892, 906 (9th Cir. 2008), 529 F.3d 892 (9th Cir. 2008), *rev'd on other grounds & remanded sub nom. City of Ontario v. Quon*, 560 U.S. 746 (2010) (citation omitted).

However, even though participants in phone conversations know that "the conversation itself is held with the risk that one of the participants may reveal what is said to others," courts have held that participants have "a reasonable expectation that police officials will not intercept and listen to the conversation." *See Maxwell,* 45 M.J. at 418 (citing *Hoffa v. United States,* 385 U.S. 293, 302 (1966)); *Quon*, 529 F.3d at 906 (same) (citing *Maxwell*, 45 M.J. at 418)).

*Maxwell* considered the different privacy concerns involved in emails stored on a server, but not yet delivered, and real-time chats. *Maxwell* noted that chats that occurred

in private chat rooms were not monitored by service provider AOL, but that AOL provided software to users to "record his or her log of the messages that transpire[d]." 45 M.J. at 411.

> In a sense, e-mail is like a letter. It is sent and lies sealed in the computer until the recipient opens his or her computer and retrieves the transmission. The sender enjoys a reasonable expectation that the initial transmission will not be intercepted by the police.
>
> .  .  .
>
> There is . . . one major difference between an e-mail message which has been transmitted via a network such as AOL and a direct computer "real time" transmission. The former transmission is stored in a centralized computer until the recipient opens his or her network and retrieves the e-mail, while the latter is lost forever, unless one of the communicators chooses to download the conversation to a disk. This latter action would be much like clandestinely recording one's telephone conversation.

*Id.* at 418.

Defendant argues that under *Maxwell*, he had a reasonable expectation that his text messages would not be intercepted by the police en route to "Ms. Wilder." (Doc. 40 at 7.) The Government responds by noting that *Maxwell* emphasized the risks inherent in sharing one's secrets with another:

> There is no protection under the Fourth Amendment for "a wrongdoer's misplaced belief that a person to whom he voluntarily confides his wrongdoing will not reveal it. . . . The risk of being overheard by an eavesdropper or betrayed by an informer or deceived as to the identity of one with whom one deals is probably inherent in the conditions of human society. It is the kind of risk we necessarily assume whenever we speak."

(Doc. 41 at 4 (quoting *Maxwell*, 45 M.J. at 418 (quoting *Hoffa,* 385 U.S. at 303) (ellipses in original).)   The Government also asserts that Defendant "knew the real-time conversation [he] was having would be seen and read by another person. The defendant assumed the risk. Once the message is received on the other device, defendant has no expectation of privacy." (*Id.* at 5.)   The Government also cites the differences *Maxwell*

18

noted between email and instant messages, and compared text messages to instant messages.

I find the Government's comparison of text messages to the chat messages in *Maxwell* apt. Both types of messages lose any confidential nature immediately upon their sending, that is to say, instantaneously—the chat messages in *Maxwell* because AOL made users aware that other users had the ability to preserve logs of messages, and text messages because people who send texts know that those with whom they text can save text exchanges on their phones for as long as they want. This type of message can be distinguished from a traditional letter or an email, which the sender can reasonably expect will remain private until the intended recipient opens it.

In addition, "[i]nterception connotes a situation in which by surreptitious means a third party overhears a telephone conversation between two persons." *United States v. Pasha,* 332 F.2d 193, 198 (7th Cir. 1964). The Act defines an "intercept" as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4). The term "electronic, mechanical, or other device" means, in pertinent part,

> any device or apparatus which can be used to intercept a wire, oral or electronic communication *other than (a) any telephone* or telegraph instrument, equipment or facility or any component thereof, . . . (ii) being used . . . by an investigative or law enforcement officer in the ordinary course of his duties.

*Id*. § 2510(5)(a)(ii) (emphasis added). Thus, under the language of the Act, Defendant's text messages were not "intercepted." Investigator Berry is an "investigative or law enforcement officer" who used Ms. Wilder's cellular telephone in the ordinary course of his duties. Accordingly, the text messages exchanged with Defendant fall within the exception to the definition of an "electronic, mechanical, or other device" in the Act.

Because there was no use of some other technical device to obtain the contents as the signal was being transmitted at a third location there was no interception under the Act.

As stated above, it is well settled that Investigator Berry did not violate Defendant's rights when he recorded his conversation with Defendant. That the "conversation" took place in a newer medium—text messaging—rather than speaking on a telephone or in person does not change the legal reasoning. Investigator Berry was clearly operating within the scope of his duties as a police investigator and member of the task force when he texted Defendant. Furthermore, Defendant did not have a legitimate expectation of privacy in the text messages he exchanged with Investigator Berry. *See Sileven*, 985 F.2d at 966; *Mack*, 53 F. Supp. 3d at 185-86. Finally, as discussed above, Government's Exhibit 3, which is a transcript of the text message exchange between Defendant and Investigator Berry, shows that Defendant participated in the text exchange about arranging the drug deal "without undue Government prompting." Thus, Investigator Berry did not "intercept" the text messages under the Act.

### c.  Conclusion

I recommend the District Court find that under the Act, Defendant does not have standing to seek suppression of the text messages he exchanged with Investigator Berry on September 1, 2018.

### 2.  Whether Investigator Berry's Conduct Fell Within the Act's Exception for Persons Acting Under "Color of Law"

Under the Act, "it shall not be unlawful . . . for a person acting under color of law to intercept . . . [an] electronic communication, where such person is a party to the communication or one of the parties to the communication has given prior consent to such interception." 18 U.S.C. § 2511(2)(c).

20

Defendant argues that Investigator Berry was not a party to the text messages at issue within the meaning of the Act "because he disguised his identity in a way that evidently fooled Mr. Griggs, or would reasonably have fooled a person in Mr. Griggs' position." (Doc. 40 at 2.) For support, Defendant cites *United States v. Kim*, 803 F. Supp. 353 (D. Haw. 1992), *aff'd*, 25 F.3d 1426 (9th Cir. 1994)).

In *Kim*, the defendant's phone was seized from him after he and his companion provided inconsistent stories when stopped trying to purchase one-way airline tickets with cash. 803 F. Supp. at 358-59. Two days after officers seized the phone, a DEA agent turned the phone on so the phone would display its own phone number. *Id.* at 359. The phone rang and the DEA agent answered it. *Id.* A man identifying himself as the defendant's brother said he was trying to reach the defendant. *Id.* at 360. The agent said the defendant was sleeping and learned about a drug deal from the caller. *Id.* at 360-61. At issue in *Kim* was whether the officer could answer a cell phone seized pursuant to a federal forfeiture law. *Id.* at 361. In framing the issue, the court stated, "[U]nless the government can point to some clearly articulated exception to the general warrant requirement, the instant interceptions, which were accomplished without a warrant, must be suppressed." *Id.*

*Kim* found that the most analogous line of cases involved situations in which officers who are searching a house pursuant to a search warrant may lawfully answer a suspect's telephone "if such is within the scope of the search as set forth by the terms of the warrant." *Id.* at 362. *Kim* discussed *United States v. Ordonez,* 737 F.2d 793 (9th Cir. 1984), which "further explained [the principle] and applied [it] to a search of the house of a cocaine dealer:"

> In *United States v. Gallo,* 659 F.2d 110 (9th Cir. 1981), we held that an officer may intercept telephone calls while executing a search warrant if the calls are reasonably related to the purpose of the search. 659 F.2d at 114. We held in *Gallo* that the search warrant need not specifically authorize

telephonic interceptions where the telephone is 'highly necessary' to the illicit business conducted on the premises. *Id.* at 114. In *Gallo* we were concerned with telephone calls made to a bookmaking establishment. It is clear to us that the telephone is highly necessary to an unlawful organization selling cocaine out of private residences.

*Id.* (quoting *Ordonez,* 737 F.2d at 810).

*Kim* held that because the phone was seized pursuant to a civil forfeiture statute and not "for any investigatory purpose, . . . one cannot draw any inference from the legal justification for the seizure to authorize the interception of telephone calls." *Id. Kim* also dispatched the Government's argument that the agent was a party to the phone conversation within the meaning of the Act. *Id.* at 362-63. Finding that the Government's position "severely strain[ed] the scope of this section," which was designed to put "legitimate undercover work outside the scope of the statute," *Kim* reasoned that the Government's reading would result in a situation where "the police would be able to freely tap into lines and answer calls known to be directed at other parties so long as they were participants in the conversation." *Id.* at 362.

> If the police saw the need for such an investigatory tool, they had more than enough opportunity to obtain a warrant—the calls were intercepted more than two days following the seizure. The fact that the telephone fortuitously rang shortly after Agent Howard turned it on to identify the number does *not* provide an exception to the general warrant requirement.
>
> . . .
>
> In this case, Agent Howard was not involved in undercover work to the extent that the caller was attempting to reach officer Howard, or to the extent that a legitimate party to the conversation had authorized Howard to answer the phone. Rather, Howard simply intercepted a call that was directed to Kim. This situation is clearly distinguishable from the undercover officer who gives a telephone number to a suspected drug dealer in order to consummate an undercover buy.

*Id.* at 262-63. Thus, the agent's interception of the incoming call without a proper warrant was an illegal interception. *Id.* at 363.

22

The Government argues that because "Investigator Berry had a search warrant to "lawfully access the device, and was working in an undercover capacity under cover of law and not simply forfeiting a telephone," he was a party to the conversation under the Act. (Doc. 41 at 11 (citing *Pasha*, 332 F.2d at 198.) The Government distinguishes the case at bar from *Kim* because the lack of authorization to search the content of the cell phone in *Kim* impacted whether the agents were operating "under color of law." (*Id.*)

I find that unlike the phone in *Kim*, which was seized pursuant to a civil forfeiture, Ms. Wilder's phone was seized pursuant to an investigation into her death. Ms. Wilder's phone was searched pursuant to a warrant based on an affidavit detailing how a search of an overdose victim's cell phone can assist investigators in identifying who supplied the victim with drugs and those involved in selling illegal narcotics. (Doc. 34-1 at 5.) The affidavit also explained that individuals involved in obtaining illegal narcotics use cell phones for the purpose of obtaining and selling illegal narcotics, that drug transactions are arranged by text conversations, that information gathered from cell phones often leads to identifying individuals involved in illegal narcotics sales, and allows investigators to further investigate the case and to expand their investigations into the sale and distribution of illegal narcotics in the area. (*Id.*) Thus, this case can be distinguished from *Kim* on that basis.[4] Here, the warrant also established ties between Ms. Wilder's phone and the illegal sale of narcotics that apparently led to her death. Once the phone was legally opened pursuant to the warrant and Investigators Berry and Isley recognized Defendant's name and tied him to the last text conversation based on Mr. Schmitt's information, using the phone to communicate with Defendant was a logical extension of the investigation. A mere forfeiture does not provide for this type of investigative use because a forfeiture is exactly that: "the act of forfeiting: the loss of property or money because of a breach

---

[4] According to Westlaw, in the 28 years since *Kim* was decided, the relevant part of the decision has only been cited three times, never by a federal court.

of a legal obligation." *Mirriam-Webster*, https://www.merriam-webster.com/dictionary/forfeiture. A forfeiture does not imply any investigative purpose, whereas the warrant involved in this case was clearly written with the purpose of investigating not only the overdose death of Ms. Wilder, but also the "investigation into the sale and distribution of illegal narcotics in the Waterloo, Iowa area." (Doc. 34-1 at 5.) In addition, the phone in *Kim* belonged to the defendant and the evidence gleaned from the conversations was used against the defendant. In the case at bar, the phone belonged to Ms. Wilder and Defendant had no expectation of privacy in the phone.

Furthermore, like *Ordonez*, which found that telephones were necessary to conduct drug sales in the 1980s, I find that Investigator Berry sufficiently detailed in his affidavit how text messages were necessary for conducting drug sales in 2018. *See* 737 F.2d at 810; Doc. 34-1 at 5 ("Your affiant knows from his experience that while arranging drug transactions individuals use verbal phone conversations along with texting conversations.") This, however, does not end the analysis because unlike the officers in *Ordonez* and *Gallo* who answered *incoming* calls, Investigator Berry sent an *outgoing* text. Investigator Berry did not happen upon text messages that popped up on Ms. Wilder's phone screen from Defendant and continue the text conversation, which would be analogous to the officers answering incoming phone calls in *Ordonez* and *Gallo*. Instead, he told Defendant that Ms. Wilder "need[ed] same as yesterday." (Doc. 34-3 at 1.)

I find that Investigator Berry was a party to the text conversation and was acting under the color of law when he texted Defendant on September 1, 2020. Investigator Berry is a police investigator and a task force member who texted with Defendant to further his investigation of this case. Moreover, by contacting Defendant and telling him "Ms. Wilder" needed heroin, he acted much the same way *Kim* stated a reasonable officer would act in this situation—by making an overture to a drug dealer which is similar to

24

*Kim's* example of giving a telephone number to a suspected drug dealer to consummate a drug buy. 803 F. Supp. at 363.

Furthermore, the legislative history of the Act supports this finding.

When amending the federal wiretap act in 1968 to its current state, Congress specifically mentioned *Pasha*[5] in its discussions of the "party to the communication" provision. In discussing § 2511(2)(c), which is *in pari materia* with § 2511(2)(d) and differs from that provision only in that § 2511(2)(c) applies to persons acting under color of law, the Senate Judiciary Committee stated:

> Paragraph 2(c) provides that it shall not be unlawful for a party to any wire or oral communication . . . to intercept such communication. It largely reflects existing law. Where one of the parties consents, it is not unlawful. . . . "[P]arty" would mean the person actually participating in the communication. (*United States v. Pasha,* 332 F.2d 193 (7th Cir. 1964)).

S. Rep. No. 90–1097, at 93–94 (1968), *reprinted in* 1968 U.S.C.C.A.N. 2112, 2182; *see also United States v. Campagnuolo,* 592 F.2d 852, 862–63 (5th Cir. 1979) (stating that "it is clear from this passage that Congress intended to reaffirm the result in *Pasha"* ). By citing *Pasha,* Congress strongly intimated that one who impersonates the intended receiver of a communication may still be a party to that communication for the purposes of the federal wiretap statute and that such conduct is not proscribed by the statute. Defendants' conduct arguably may give rise to liability under other statutes or the common law, but it is not a violation of the ECPA.

*Clemons v. Waller*, 82 F. App'x 436, 442 (6th Cir. 2003).

Therefore, Investigator Berry was a party to the conversations and was acting under color of law when he impersonated Ms. Wilder in text messages he exchanged with Defendant on September 1, 2018.

---

[5] *United States v. Pasha* held that no interception occurred when FBI agents answered ringing telephones in an apartment where they were executing a search warrant and pretended to be the intended recipients of the phone calls. 332 F.2d 193, 198 (7th Cir. 1964).

25

### 3. Whether Defendant is entitled to Suppression of Evidence Under the Act

Even assuming that Defendant is an "aggrieved person" under the Act because he was a person against whom an alleged interception was directed, *see* 18 U.S.C. Section 2510(11), Defendant is not entitled to suppression of evidence under the Act. As explained above, Defendant's text messages were not intercepted under the Act and Investigator Berry's conduct fell within the Act's exception for persons acting under the color of law because he was a party to the text communications. Therefore, Defendant is not entitled to suppression of evidence under the Act. *See id.* §§ 2511(2)(c), 2518(10)(a); *Maxwell*, 45 M.J. at 418 ("There is no protection. . . for a wrongdoer's misplaced belief that a person to whom he voluntarily confides his wrongdoing will not reveal it.").

Moreover, even if Defendant's text messages had been "intercepted" under the Act, suppression of "electronic communications" is not provided for in the Act. *See United States v. Forest,* 355 F.3d 942, 949 (6th Cir. 2004) (citing 18 U.S.C. §§ 2511[6], 2518(10)(c)[7]), *vacated on other grounds sub nom. Garner v. United States*, 543 U.S. (2005); *United States v. Rice*, 716 F. App'x 121, 123 (3d Cir. 2017) ( "The Wiretap Act does not provide a suppression remedy for electronic communications unlawfully acquired under the Act."); *United States v. Steiger*, 318 F.3d 1039, 1050 (11th Cir. 2003) "By its terms, 18 U.S.C. § 2515 applies *only* to "wire or oral communication[s]," and not to "electronic communications") (alterations in original); *United States v. Navas,* 640 F. Supp. 2d 256, 262–63 (S.D.N.Y. 2009) (same result under Electronic Communications Privacy Act ("ECPA")), *rev'd in part on other grounds*, 597 F.3d 492

---

[6] Sections 2511(4) and 2511(5) provide punishments for those who violate the Act, including fines, imprisonment, and injunctive relief. 18 U.S.C. §§ 2511(4)-(5).

[7] Section 2518(10)(c) provides that "[t]he remedies and sanctions described in this chapter with respect to the interception of electronic communications are the only judicial remedies and sanctions for nonconstitutional violations of this chapter involving such communications."

(2nd Cir. 2010); *United States v. Jones*, 364 F. Supp. 2d 1303, 1308-09 (D. Utah 2005) (finding no implied basis for suppression in an alleged negative implication in Section 2517).

### 4.     Recommendation

I recommend that the District Court find that Defendant does not have standing under the Wiretap Act to seek suppression of the September 1, 2018 text messages on Ms. Wilder's cell phone. Even if Defendant has standing, the Court should conclude that the Act does not provide a suppression remedy for the text communications Defendant exchanged with Investigator Berry on September 1, 2018/electronic communications.

### D.     Whether Officers' Approach of Mr. Scaturro's Vehicle, Seizure of Defendant, Seizure of Defendant's Cell Phone, and Arrest of Defendant Violated the Fourth Amendment

Defendant argues that his Constitutional rights were violated at every step of the process on September 1, from when he and Mr. Scaturro drove from Casey's to Perkins through his post-arrest interview at the Waterloo Police Department. Each of his arguments will be addressed below.

### 1.     Whether Officers had Reasonable Suspicion to Approach Mr. Scatturo's Vehicle

Defendant argues that law enforcement did not have reasonable suspicion to conduct an investigatory stop of Mr. Scaturro's vehicle or to secure him outside of the vehicle.[8] Specifically, he argues that "while law enforcement possibly had incriminating information about someone named 'Eric Griggs,' they could not say the passenger in Scaturro's vehicle was indeed that person." (Doc. 26 at 12.) Defendant argues that

---

[8] Defendant calls the stop a "traffic stop." However, the vehicle was already parked when approached by officers, so an investigative stop is a more apt description.

although Investigator Isley believed the passenger in the Explorer was Eric Griggs, "no explanation is given as to why [Investigator] Isley had this belief. No physical description of the 'Eric Griggs' contact is given, nor is the physical description of the passenger in the Explorer." (*Id.* at 9.) Furthermore, Defendant asserts that law enforcement had no description of the vehicle he would supposedly be driving for the alleged drug deal, no one attempted to discover Defendant's whereabouts on the night of August 31, and Defendant and Mr. Scatturo engaged in perfectly legal and innocuous activity prior to when law enforcement "converged" on the Explorer: they stopped at a Casey's gas station and then in a Perkins parking lot for a short time. (*Id.* at 9, 10.)

A police officer may stop and briefly question a person if the officer has reasonable, articulable suspicion of criminal activity. *See Terry v. Ohio*, 392 U.S. 1, 21 (1968). Reasonable suspicion requires more than a hunch that criminal activity is afoot. *United States v. Griffith*, 533 F.3d 979, 984 (8th Cir. 2008); *United States v. Steffens*, No. 19-CR-4022-LTS-KEM, 2019 WL 3304815, at *5 (N.D. Iowa 2019). "To satisfy the Fourth Amendment, officers must be able to articulate some minimal, objective justification for a *Terry* stop." *Griffith*, 533 F.3d at 984 (citation omitted). The determination of whether an investigatory stop was justified is based on the totality of the circumstances in light of the officers' experiences. *United States v. Banks*, 553 F.3d 1101, 1105 (8th Cir. 2009). During a *Terry* stop, officers must "employ the least intrusive means of detention and investigation, in terms of scope and duration, that are reasonably necessary to achieve the purpose of the *Terry* stop." *United States v. Navarrete-Barron*, 192 F.3d 786, 790 (8th Cir. 1999) (citing *Florida v. Royer*, 460 U.S. 491, 500 (1983)). Officers may check for weapons and may take any additional steps that are "reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop." *Id.* (quoting *United States v. Hensley*, 469 U.S. 221,

235 (1985)); *United States v. Sanford*, No. 14-CR-2036-LRR, 2014 WL 6680797, at *3 (N.D. Iowa Nov. 24, 2014), *aff'd*, 813 F.3d 708 (8th Cir. 2016).

I find that based on the totality of the circumstances, law enforcement had reasonable, articulable suspicion of criminal activity that justified approaching Mr. Scaturro's Explorer on September 1. Investigator Isley learned from Mr. Schmitt that Ms. Wilder's dealer was a "skinny black male" and that he was likely the last person she communicated with on Facebook Messenger on August 31. Pursuant to a search warrant, Investigator Berry searched Ms. Wilder's phone and discovered that the last person Ms. Wilder communicated with via Messenger on August 31 was Eric Griggs. This finding logically led to Eric Griggs's Facebook profile. Investigator Berry testified that both he and Investigator Isley had worked for several years on the task force, and Mr. Griggs's name "came up before." (Doc. 46 at 12.) Investigator Berry believed they not only looked at Mr. Griggs's Facebook page associated with the Messenger account, but also at photos they already had of Mr. Griggs. He also believed that Mr. Isley was "somewhat familiar" with what Mr. Griggs looked like. Investigator Berry further testified that although neither his report nor Investigator Isley's report indicates that they looked at photographs of Defendant, it is "obviously would be common practice" to look at photographs associated with Facebook Messenger accounts, and if there was an issue with not knowing what someone looked like, "we would have looked at a photograph which we can easily obtain in seconds." (*Id.* at 32-33.) Investigator Berry stated,

> I just think if that was an issue that we would have addressed that. I think that we were -- we were confident on what Mr. Griggs looked like and who we were looking for when we were at the gas station and at Perkins conducting surveillance.

(*Id.* at 34.)

Investigator Berry testified that based on Mr. Schmitt's information that Ms. Wilder's dealer was likely the last person she communicated with via Messenger on

August 31 and finding messages consistent with a drug deal between Eric Griggs and Ms. Wilder as her final Messenger communications on that date, they felt "fairly confident" of who Eric Griggs was. (*Id.*) This was in spite of there being multiple Eric Griggs profiles on Facebook (which law enforcement did not search) and in spite of Ms. Wilder communicating with several other people regarding illegal narcotics purchases in the days leading up to her death. Investigator Berry testified that had he been assigned to investigate something other than the death of Ms. Wilder, he may have focused on a different person, but when focusing on that issue, Eric Griggs was the obvious relevant contact.[9] (*Id.* at 28.)

Once Investigator Berry began sending text messages to Defendant, the two arranged to meet at a Casey's gas station near a Perkins restaurant. (Doc. 34-3 at 2.) At 4:19 p.m., Defendant asked if they were meeting at the Casey's on University and Investigator Berry confirmed that they were. (*Id.* at 3.) At 4:35, Investigator Berry received a text from Eric Griggs stating that he was at Casey's, which coincided with Investigator Berry's observation of the Explorer arriving at Casey's. (*Id.* at 4.) Investigator Isley believed the person in the passenger seat of the Explorer was Eric Griggs.[10] (Doc. 26-1 at 15.)

---

[9] I find Investigator Berry's explanation credible and reasonable. In addition, this explanation also suffices to explain why "[p]olice did not attempt to determine Griggs's whereabouts the night before [September 1]," something Defendant contends they should have done. (Doc. 26 at 10.) There simply was no reason to know Defendant's "whereabouts" when text messages gave officers the information they needed regarding a drug transaction between Defendant and Ms. Wilder. Moreover, Investigator Berry had the transcripts of Ms. Wilder's August 31 conversations with Mr. Schmitt, which corroborated the drug deal between Defendant and Ms. Wilder that took place in Dewar, Iowa and that Ms. Wilder dropped Defendant off on the south side of Cedar Falls shortly before 8:55 p.m.

[10] Defendant argues that no one provided a description of the passenger in the Explorer, whom Investigator Isley identified as "Eric Griggs." (Doc. 26 at 9.) I do not find this to be problematic when Investigator Berry has explained the past experience both he and Investigator Isley had with Defendant. In this situation, Investigator Isley's visual identification sufficed.

30

Defendant argues that parking at a Casey's and driving to a Perkins are innocent acts, that the only "witness statements" are "from [Investigator] Isley's conversation with Schmitt on September 1 intimating that Wilder's dealer was a 'skinny black male,'" and that there was not a description of what type of vehicle Defendant would be driving. (Doc. 26 at 10.) First, the seemingly innocent acts of parking at Casey's and driving to Perkins are not judged in isolation. *See Terry*, 392 U.S. at 22 (reasoning that had the officer noticed defendants "go through a series of acts, each of them perhaps innocent in itself, but which taken together warranted further investigation. . . . It would have been poor police work indeed for an officer of 30 years' experience in the detection of thievery from stores in this same neighborhood to have failed to investigate this behavior further."); *United States v. Stewart*, 631 F.3d 453, 457 (8th Cir. 2011) ("[F]actors that individually may be consistent with innocent behavior, when taken together, can give rise to reasonable suspicion, even though some persons exhibiting those factors will be innocent.") (citation omitted).

When looking at them based on the totality of the circumstances, the Explorer's movements tracked with the text messages Investigator Berry was exchanging with Eric Griggs regarding a meeting to buy heroin. The Explorer stopped at Casey's when Eric Griggs said he was at Casey's and moved to Perkins where "Ms. Wilder" said she was eating with her mother and from where she said she would leave to meet Eric Griggs and get into his car. Second, Investigators were not working with only a description of a "skinny black male." As noted above, Investigators Isley and Berry were confident they knew what Mr. Griggs looked like and Investigator Isley was able to identify him as the passenger in the Explorer. Third, although officers had no information regarding the car Eric Griggs would be in at the time of the drug deal, when the Explorer arrived at the designated meeting location at the specified time and at the time Investigator Berry received a text message from Eric Griggs saying he was at Casey's, moved to the Perkins

parking lot when "Ms. Wilder" said she was coming, and then when officers identified Eric Griggs in the passenger seat of the Explorer, knowing the model of the vehicle was immaterial. The movements of the vehicle and Eric Griggs's presence in the vehicle at the pre-arranged location for the drug sale were enough to provide officers reasonable suspicion to conduct an investigative stop of the vehicle.

Finally, Defendant argues that his case is analogous to *United States v. Black*, which held there was not reasonable suspicion to support a traffic stop. 104 F. Supp. 3d 997, 1000, 1011 (W.D. Mo. 2015) (adopting R. & R.). In *Black*, the defendant's car had been observed on each of three days prior to his arrest at an auto detailing shop where law enforcement believed illegal drug activity was occurring, although the defendant was never confirmed as being at the shop. *Id.* at 1001-02. One of the officers' justifications for conducting a traffic stop was that they had reasonable suspicion that defendant was involved in a drug crime because they believed drugs and guns were being sold out of the auto detailing shop where the defendant's car had been observed.[11] *Id.* at 1008-09. During the traffic stop, officers smelled marijuana and learned the defendant had outstanding warrants. *Id.* at 1000-01. Searches of the defendant and his car yielded marijuana, cocaine, and a firearm. *Id.* at 1001. *Black* held that "[a]lthough an argument can be made that police had reasonable suspicion that illegal drug activity was going on at the auto detailing shop, they did not have reasonable suspicion to believe that *defendant* would be in possession of illegal drugs at the time he was stopped." *Id.* at 1010 (emphasis in original). The officers "had no incriminating information" about the defendant and could not even say whether the defendant was driving his car when it was seen at the auto detailing shop. *Id.* at 1011.

---

[11] The officers' first justification was that the defendant had been stopped for having an obstructed windshield in violation of a city ordinance. *Black*, 104 F. Supp. 3d at 1000, 1003. The court found the defendant did not violate the ordinance. *Id.* at 1008.

Defendant asserts that his case is analogous to *Black* because "while law enforcement possibly had incriminating information about someone named 'Eric Griggs,' they could not say that the passenger in Scaturro's vehicle was indeed that person." (Doc. 26 at 12.) However, as discussed above, both investigators felt confident they knew what Defendant looked like by the time they observed Mr. Scaturro's Explorer at Casey's. They had looked at the Eric Griggs's Facebook profile associated with the Messenger account that was texting with Ms. Wilder the night before she died and they looked at other photographs. This was such standard procedure for officers involved in this type of work that Investigator Berry did not feel it merited documenting. Although it would be helpful if this step had been documented, I found Investigator Berry a credible witness who, as will be discussed below, readily admitted when he made an error. In addition, and as discussed above, Investigator Berry had the contemporaneous text messages he was exchanging with Eric Griggs and the associated movements of the Explorer that also corroborated the identity of the only "skinny black male" in the vehicle. Investigator Berry testified that no other vehicles containing men matching Eric Griggs's description made movements that comported with the contemporaneous text messages. Therefore, I find Defendant's argument that law enforcement could not say the passenger was Eric Griggs is without merit. (Doc. 46 at 54-55.)

Based on the totality of the circumstances, law enforcement reasonably believed that Defendant was in the parking lot to sell heroin and therefore would be in possession of heroin. I find that law enforcement was justified in approaching the vehicle and conducting an investigative stop.

33

2. *Whether the Investigatory Stop and Initial Seizure of Defendant was Conducted in a Manner Reasonably Related in Scope to the Circumstances that Justified the Stop*

Before discussing these issues, it is necessary to address what evidence Defendant wants suppressed if he prevails in this aspect of his motion. A passenger who asserts "neither a property nor a possessory interest" in a vehicle lacks a reasonable expectation of privacy in that vehicle. *United States v. Davis*, 943 F.3d 1129, 1132 (8th Cir. 2019) (quoting *Rakas v. Illinois*, 439 U.S. 128, 148 (1978)). Thus, even if a search of a vehicle is unlawful, a passenger without such an interest in the vehicle normally cannot challenge its search or suppress resulting evidence. *United States v. Anguiano*, 795 F.3d 873, 878-79 (8th Cir. 2015). Defendant concedes that if Mr. Scaturro gave consent for the search of the Explorer, he cannot seek suppression of the heroin and drug paraphernalia found during the search of the Explorer. (Doc. 26 at 13.) Mr. Scaturro gave permission for the search. (Doc. 26-1 at 15.) Therefore, the only evidence seized at Perkins on September 1 that is at issue is any evidence found on Defendant's cell phone, which was seized as he exited the Explorer. This evidence includes the September 1 text messages Defendant exchanged with Investigator Berry.

During a *Terry* stop, officers must "employ the least intrusive means of detention and investigation, in terms of scope and duration, that are reasonably necessary to achieve the purpose of the *Terry* stop." *Navarrete-Barron*, 192 F.3d at 790. Officers may check for weapons and may take any additional steps that are "reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop." *Id.*; *Sanford*, 2014 WL 6680797, at *3.

> A *Terry* stop that is supported by reasonable suspicion at the outset may nonetheless violate the Fourth Amendment if it is excessively intrusive in its scope or manner of execution." *United States v. Johnson*, 592 F.3d 442, 451 (3d Cir.2010). Accordingly, the Supreme Court in *Terry* created a dual inquiry whereby we examine (1) whether the investigatory stop is lawful at

34

the outset, and (2) whether the manner in which the stop was conducted "was reasonably related in scope to the circumstances which justified the interference in the first place." *Terry,* 392 U.S. at 19–20, 88 S. Ct. 1868.

.   .   .

The Supreme Court has long recognized an officer's right to conduct an investigatory stop inherently includes the right to use some degree of physical force or threat to effect the stop. *Graham v. Connor,* 490 U.S. 386, 396, 109 S. Ct. 1865, 104 L.Ed.2d 443 (1989). "The use of handcuffs is the use of force, and such force must be objectively reasonable under the circumstances." *Muehler v. Mena,* 544 U.S. 93, 103, 125 S. Ct. 1465, 161 L.Ed.2d 299 (2005) (Kennedy, J., concurring) (citing *Graham,* 490 U.S. at 397, 109 S. Ct. 1865). With this in mind, we have previously held officers may use handcuffs as a reasonable precaution to protect the officers' safety and maintain the status quo during the *Terry* stop. *United States v. Martinez,* 462 F.3d 903, 907 (8th Cir.2006). "However, the use of handcuffs is greater than a *de minimus* intrusion and thus requires the [officer] to demonstrate that the facts available to the officer would warrant a man of reasonable caution in the belief that the action taken was appropriate." *Lundstrom v. Romero,* 616 F.3d 1108, 1122 (10th Cir.2010) (internal quotation marks and citation omitted).

*El-Ghazzawy v. Berthiaume*, 636 F.3d 452, 457 (8th Cir. 2011). "A de facto arrest occurs when the officer's conduct is more intrusive than necessary for a *Terry* investigative stop." *United States v. Sanford*, 813 F.3d 708, 712-13 (8th Cir. 2016) (citation omitted). "There is no clear line between investigative stops and de facto arrests." *Id.* (quotation omitted).

Defendant challenges his removal from the Explorer immediately upon encountering law enforcement. I find that officers had reason to remove Defendant from the Explorer and conduct a protective frisk. As discussed above, officers had reasonable suspicion that Defendant was selling heroin. "There is a 'close and well-known connection between firearms and drugs.'. . . 'Firearms are known "tools of the trade" of narcotics dealing because of the dangers inherent in that line of work.'" *United States v. Claxton*, 276 F.3d 420, 423 (8th Cir. 2002) (quoting *United States v. Fuller*, 887 F.2d

144, 147 (8th Cir. 1989) (internal quotation omitted)). Therefore, officers were justified in doing what was necessary to insure Defendant was not carrying a weapon to conduct his heroin sale.

Officers were also justified in searching the Explorer because the Explorer's arrival at the agreed-upon site of a drug deal carrying Eric Griggs, whose contemporaneous text messages tracked the Explorer's movements, provided probable cause to search the Explorer for drugs. Evidence that a vehicle contains illegal drugs provides probable cause to search the vehicle. *See United States v. Smith*, 789 F.3d 923, 928 (8th Cir. 2015) ("This court has held numerous times that the smell of marijuana coming from a vehicle during a proper traffic stop gives an officer probable cause to search for drugs.") (gathering cases). Most importantly, although Investigator Berry told Defendant that he was merely being detained when he was first removed from the Explorer and given a *Miranda* warning, officers had enough probable cause to arrest him at that time based on the text messages he exchanged with Ms. Wilder on August 31, the text messages he exchanged with Investigator Berry on September 1 arranging a heroin deal, and all the contemporaneous text messages and movements of the Explorer that ended with the Explorer at the agreed site for the heroin sale. The heroin and drug paraphernalia officers found in the Explorer during their search only added to officers' probable cause. Accordingly, I find that the investigatory stop and initial seizure was conducted in a manner reasonably related to the circumstances that justified the stop. Therefore, Defendant's cell phone need not be suppressed on this basis.

### 3.    *Whether the Immediate Seizure of Defendant's Cell Phone was Justified*

Defendant asserts that law enforcement had no reason to immediately seize his phone when they first encountered him during the investigative stop because, as previously discussed, the seizure of the cell phone was part of the illegal seizure of his

36

person. The Government responds that exigent circumstances required that they seize the phone immediately so as to preserve its contents. (Doc. 34 at 14.)

> Where law enforcement authorities have probable cause to believe that a container holds contraband or evidence of a crime, but have not secured a warrant, the Court has interpreted the [Fourth] Amendment to permit seizure of the property, pending issuance of a warrant to examine its contents, if the exigencies of the circumstances demand it or some other recognized exception to the warrant requirement is present." *United States v. Clutter,* 674 F.3d 980, 985 (8th Cir.2012), *quoting United States v. Place,* 462 U.S. 696, 701, 103 S. Ct. 2637, 77 L.Ed.2d 110 (1983).

*United States v. Goodale*, 738 F.3d 917, 922 (8th Cir. 2013) (brackets in original); *see also United States v. Wainright*, No. 3:18-05010-CR-RK, 2019 WL 7282501, at *2 (W.D. Mo. Dec. 27, 2019) ("Because the police had probable cause to believe Defendant's cell phone contained evidence of sex crimes involving children, they were allowed to secure the phone to preserve the status quo while a search warrant was being sought.") (quotation and alteration omitted); *United States v. Stephen*, No. 18-CR-31-CJW, 2018 WL 4839065, at *9 (N.D. Iowa Oct. 4, 2018) (Government's temporary retention of USB justified because it had probable cause to believe USB contained contraband, knew defendant was looking for USB, and could reasonably believe defendant would destroy USB if government returned USB to defendant) (citing *Goodale*, 738 F.3d at 922).

It was reasonable to conclude that the phone in Defendant's hand when he stepped out of the Explorer was the same one he was using to text with Investigator Berry to arrange the heroin buy only moments before. Thus, it was reasonable to conclude it contained evidence of a crime. Seizure of the phone was reasonable to prevent the destruction of evidence. *Goodale*, 738 F.3d. at 922. Investigator Berry testified that it is important to separate cell phones from their users in situations such as these because "evidence is destroyed very easily in person and . . . other ways too, [including]

"remotely." (Doc. 46 at 18.) Based on these facts, I find that law enforcement had probable cause to secure Defendant's cell phone to prevent the destruction of evidence.[12] *See id.* Therefore, Defendant's cell phone need not be suppressed on this basis.

### 4. *Whether there was Probable Cause to Arrest Defendant*

I have already found that law enforcement lawfully seized Defendant at the outset of the investigative stop because officers had evidence that he provided Ms. Wilder with heroin and intended to sell her more heroin on September 1. After receiving permission from Mr. Scatturo to search the Explorer, officers found heroin and drug paraphernalia in the center console of the Explorer.

Officers may affect a warrantless arrest when there is probable cause to believe someone has committed or is committing a crime. *United States v. Winarseke,* 715 F.3d 1063, 1066 (8th Cir. 2013) (citing *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004)). Officers need not observe actual criminal activity, but view the facts objectively to determine whether a reasonable police officer would find they amount to probable cause. *Id.* at 1066-67 (quoting *Maryland v. Pringle*, 540 U.S. 366, 371 (2003)). "[T]he mere probability or substantial chance of criminal activity, rather than an actual showing of criminal activity, is all that is required." *Id.* at 1067 (quoting *United States v. Mendoza*, 421 F.3d 663, 667 (8th Cir. 2005)).

I find that officers had probable cause to arrest Defendant. They had a history of text communications between Ms. Wilder and Defendant on the day before she died arranging for the sale of heroin, which was corroborated as such by Mr. Schmitt. On September 1, Defendant texted with Investigator Berry to arrange a heroin deal that Defendant then tried to complete by arriving at the pre-arranged location at the designated time. Officers also found heroin and drug paraphernalia in the Explorer. Thus, I find

---

[12] Investigator Berry did not access the contents of the phone until he obtained a search warrant to do so. (Doc. 46. at 23.)

38

that under these facts, an objective police officer would find probable cause to arrest Defendant. *Id*.

### 5. Recommendation

I recommend the District Court find that the approach of Mr. Scatturo's vehicle, seizure of Defendant, seizure of Defendant's cell phone, and arrest of Defendant were all reasonable within the Fourth Amendment.

### E. Whether Evidence must be Suppressed as Fruit of the Poisonous Tree

Defendant argues that "because law enforcement conducted an illegal stop and seizure, all fruits obtained therefrom must be suppressed." (Doc. 26 at 13.) Specifically, Defendant asserts that evidence obtained during the search of his cell phone must be suppressed and any statements he made subsequent to his seizure must be suppressed. Although I have concluded that Defendant was lawfully seized and arrested upon probable cause, which means there is no tree to bear poisonous fruit, the following analysis is necessary, should the District Court disagree with my above analysis and conclusions.

### 1. Whether the Contents of Defendant's Cell Phone must be Suppressed

The contents of Defendant's cell phone were not accessed until Investigator Berry had obtained a search warrant to do so. (Doc. 26-1.) Defendant proffers two arguments for why the contents of his cell phone should be suppressed: 1) "what [Investigator] Berry did was either a wiretap, or walked right up to the line of a being a wiretap. . . [and] he should have obtained authorization via a court order to engage in such conduct," and 2) the *Leon* good faith exception to the requirement of a valid warrant does not apply to the warrant to search the phone. (Doc. 26 at 15-17.) In short, Defendant argues that the fact that law enforcement obtained a search warrant for Defendant's cell phone does not

39

untaint" the illegalities[13] in this case. (Doc. 40 at 8.) Defendant also asserts that he is entitled to a hearing under *Franks v. Delaware*, 438 U.S. 154 (1978).

### a. Whether Defendant has Made a Substantial Preliminary Showing he is Entitled to a Franks Hearing

Defendant takes issue with the following paragraph in the affidavit in support of the warrant to search his cell phone:

> Investigator Isley met with Wilder's boyfriend Jeffrey Schmitt at the Black Hawk County Jail. Schmitt provided the passcode for Wilder's phone and told Investigator Isley he believed Wilder was using heroin and was being supplied that heroin by an individual he identified as Eric Griggs.

(Doc. 26-1 at 11.)

Defendant argues that "this is patently untrue" because Investigator Isley's report states that Mr. Schmitt did not know the name of Ms. Wilder's supplier, but described him as a "skinny black male." (Doc. 26 at 16.) According to Defendant, this paragraph misled the judge who issued the warrant because it identified Defendant as the person who supplied Ms. Wilder's heroin when that person was actually unknown. The Government does not contest that this statement is untrue. Investigator Berry, who wrote the affidavit, testified to the following regarding this paragraph:

> So when I -- when I rehash this, I don't have a clear answer to how that -- how that was put in that search warrant addendum. And I apologize for

---

[13]

> *Leon* of course dealt with the judicially developed exclusionary rule for Fourth Amendment violations, whereas we deal here with a statutory exclusionary rule imposed for a "violation of this chapter." However, § 2518(10)(a) is worded to make the suppression decision discretionary ("If the motion is granted"), and its legislative history expresses a clear intent to adopt suppression principles developed in Fourth Amendment cases. See S. Rep. No. 1097, 1968–21968–2 U.S.C.C.A.N. at 2185. Therefore, we conclude that the subsequently-developed *Leon* principle applies to § 2518(10)(a) suppression issues.

*U.S. v. Moore*, 41 F.3d 370, 376 (8th Cir. 1994).

that. That's -- I mean, I kind of dropped the ball on that. I think that was through some miscommunication between Mr. Isley and I, and I didn't in any way intentionally put that in there knowing that. According to Investigator Isley's report is that Mr. Griggs identify -- or Mr. Schmitt identified a skinnier black male as the last person that would have had contact with [Ms.] Wilder as who he believed was who Abigail or Miss Wilder would have obtained that heroin from the previous night.

(Doc. 46 at 24.) Defendant argues that the affidavit was misleading because it contains the incorrect information that Jeffrey Schmitt identified him by name.

### i. *Legal Standard*

*Franks* held that a defendant is entitled to a hearing when he "makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and . . . the allegedly false statement is necessary to the finding of probable cause." 438 U.S. at 155-56. Showing a false statement in an affidavit was inserted deliberately or with reckless disregard for the truth "is 'not lightly met.'" *United States v. Lucca*, 377 F.3d 927, 931 (8th Cir. 2004) (quoting *United States v. Wajda*, 810 F.2d 754, 769 (8th Cir. 1987)). A defendant must "point out specifically the portion of the warrant affidavit that is claimed to be false; and [the allegations] should be accompanied by a statement of supporting reasons." *Id.* (quoting *Franks*, 438 U.S. at 171) (alterations in original). To receive a *Franks* hearing, a defendant must show "'both (1) that the affiant [ ] knowingly and intentionally made false statements or made them in reckless disregard for the truth and (2) if the false information is excised (or the omitted information is included), the affidavit no longer establishes probable cause.'" *United States v. Daigle*, 947 F.3d 1076, 1083 (8th Cir. 2020) (quoting *United States v. Arnold*, 725 F.3d 896, 898 (8th Cir. 2013) (brackets in original), *reh'g denied* (Mar. 10, 2020)).

"Mere allegations of deliberate or reckless falsehoods are insufficient." *United States v. Kattaria*, 553 F.3d 1171, 1177 (8th Cir. 2009) (citing *United States v.*

*Mathison,* 157 F.3d 541, 548 (8th Cir. 1998)).  Defendant must provide the court with a reason to believe the information in the affidavit was a deliberate or reckless falsehood. *Id.*  To make a showing of reckless disregard for the truth, the defendant must show that the affiant "must have entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information" he reported. *United States v. Reed*, 921 F.3d 751, 756 (8th Cir. 2019) (quoting *United States v. Conant*, 799 F.3d 1195, 1200 (8th Cir. 2015)). "Recklessness can be inferred from the omission 'when the material omitted would have been clearly critical to the finding of probable cause.'" *Id.* (quoting *Conant*, 799 F.3d at 1200). If the defendant fails to make "a 'strong initial showing' of deliberate falsehood or reckless disregard for the truth," a *Franks* hearing "must be denied." *United States v. Freeman*, 625 F.3d 1049, 1052 (8th Cir. 2010) (quoting *United States v. Pennington*, 287 F.3d 739, 743 (8th Cir. 2002)).

### ii.    *Whether Investigator Berry Acted Deliberately or with Reckless Disregard for the Truth*

In the case at bar, Defendant has not demonstrated that Investigator Berry substituted "Eric Griggs" for "a skinny black male" in his warrant affidavit deliberately or with reckless disregard for the truth.  In addition to the testimony recited above, Officer Berry and Defense Counsel had the following exchange during the hearing:

> Q.    [Y]ou agree, don't you, that your search warrant addendum indicates that Schmitt identified Ms. Wilder's heroin source by the name Eric Griggs?
>
> A.    That's what it says, yes.
>
> Q.    But that's not true. He didn't identify the source as a person named Eric Griggs; right?
>
> A.    I don't have a clear and concise answer for that, and after reviewing it, I apologize. I mean, I didn't intentionally put that in there. And I don't know why it ended up in there, and I just -- it's unnecessary. And as far as what I believed was the probable cause for the search of the stuff and again, I apologize for that.

Q.    Well, Investigator Isley never told you that [Jeffery] Schmitt said that Ms. Wilder's heroin source was Eric Griggs; right?

A.    I don't know that. Like I said before, I'm the case agent on this investigation. I take full responsibility for it. I don't think it was -- it was a misunderstanding between communication between Isley and I, and I don't believe I probably asked enough questions.

Q.    Do you work with Investigator Isley for -- well, let me ask you this. How long have you worked with Investigator Isley?

A.    I believe during that interview he said he was there for five years at the time of that. And then we worked up – we still work together. . . .

Q.    And you don't have any reason to believe that Investigator Isley would have relayed information to you that was untrue; right?

A.    No. I think like I -- again, I think it was a miscommunication between us two.

Q.    So if [Jeffery] Schmitt hadn't told Investigator Isley Eric Griggs's name, you don't have any reason to think that Investigator Isley would have come to you and said, hey, [Jeffery] Schmitt identified the guy as Eric Griggs; right?

A.    I just don't know how that transpired exactly.

Q.    Because there's no report regarding that; right?

A.    Well, and the fact is, you know, I wrote that – I authored that search warrant, you know, a few days later. So I don't know if some -- like our several communications during that time, you know, in that day I misconstrued something he told me or, like I said, I'm not trying to make excuses for why I put that in there. I'm just trying to -- I'm trying to understand myself also, and I take full responsibility for it. And I believe that what Investigator Isley put in his report is obviously correct.

(Doc. 46 at 41-43.)   There is no evidence to the contrary in the record and I found Investigator Berry to be a credible witness.  The misinformation in the warrant was included because of a miscommunication and Investigator Berry takes full responsibility for its inclusion.  He admits that what he included in the warrant is not what Investigator Isley put in his report. Thus, while the affidavit admittedly contains incorrect information, I find that the information was not purposely included and certainly was not included

deliberately or with reckless disregard for the truth. *See Freeman*, 625 F.3d at 1052. I also find that Investigator Berry did not entertain serious doubts as to the truth of his statement or have obvious reasons to doubt the accuracy of the information he reported in the affidavit. *See Reed*, 921 F.3d at 756. Rather, this appears to be an honest mistake where Investigator Berry likely confused what he and Investigator Isley knew at the time Investigator Isley wrote his report and what Investigator Berry knew at the time he wrote his affidavit in support of the warrant.

### iii. *Whether Omitting the False Information Would Have Altered Probable Cause*

As to the second requirement for a *Franks* hearing, a hearing must be denied when, even assuming the truth of the alleged omissions, such omissions or concealments would not have altered the finding of probable cause. *Arnold*, 725 F.3d at 899 (finding that probable cause still existed even when misrepresentations were excised from the affidavit). As the Eighth Circuit reiterated earlier this year, at the second step, the court must determine whether the affidavit still establishes probable cause if the false information is excised or the omitted information is included. *Daigle*, 947 F.3d at 1083.

Even if the District Court rejects my recommendation and finds that Investigator Berry intended to mislead the issuing judge or acted with reckless disregard for the truth, Defendant is not entitled to a *Franks* hearing. Such a finding is valid only if the omitted material was "clearly critical to the finding of probable cause." *United States v. Jacobs*, 986 F.2d 1231, 1235 (8th Cir. 1993) (quotation omitted). Information or an omission is clearly critical to the finding of probable cause if, absent such information or omission, there would not be a fair probability that contraband or evidence of a crime would be found in the place to be searched. *United States v. Smith*, 581 F.3d 692, 695 (8th Cir. 2009) (finding that "omission of the fact that [the defendant's] trash included mail addressed to other persons at 4401 5th Avenue South, and that trash from two garbage

cans might have been pulled, raising the possibility that the drug residue and paraphernalia came from the other unit's trash, did not eliminate the affidavit's showing of a fair probability that evidence of narcotics trafficking could be found in [the defendant's home]").

Thus, the first question before the Court is whether Investigator Berry's false statement that Mr. Schmitt said that he believed Ms. Wilder's heroin supplier was Eric Griggs was necessary for the issuing judge to find probable cause. *See Franks*, 438 U.S. at 155-56. The second question is whether the omissions discussed above were "clearly critical" for the issuing judge to find probable cause. *See Jacobs*, 986 F.2d at 1235.

I find that Investigator Berry's false statement was not necessary to the finding of probable cause. Investigator Berry's eight-page affidavit in support of his warrant application detailed the following events and included the following information:

- Being called to the scene of Ms. Wilder's death and finding Ms. Wilder's cell phone;
- Investigator Isley talking to Mr. Schmitt at the Black Hawk County jail and learning the passcode to Ms. Wilder's phone;
- Mr. Schmitt's belief that Ms. Wilder was actively using heroin;[14]
- Finding the messages between Eric Griggs and Ms. Wilder on Ms. Wilder's phone, and including "only a small portion of the text and Facebook messages exchanged between WILDER and GRIGGS beginning on August 28" that he believed showed that Ms. Wilder was obtaining narcotics from Eric Griggs;
- Investigator Berry's belief that Eric Griggs was the last person who saw Ms. Wilder alive;
- Large sections of the recorded phone conversations between Mr. Schmitt and Ms. Wilder from August 31 that documented Ms. Wilder's trip to, around, and from Dewar, Iowa to pick up heroin, much of it with her heroin supplier in her car, her arrival back home, and Mr. Schmitt's admonition to Ms. Wilder not to do too much "H" at one time;
- Sections of the text messages he exchanged with Defendant arranging to buy heroin and what the text messages said when Defendant arrived at the meet location;

---

[14] This is where I have omitted the information about the identity of Ms. Wilder's heroin supplier.

- Information about a white Explorer with a passenger who Investigator Isley believed to be Eric Griggs first being observed at the Casey's and then moving to Perkins;
- the investigative stop of the Explorer, including the detainment of Defendant and Mr. Scaturro;
- The seizure of Defendant's and Mr. Scaturro's cell phones, and the contraband found in the Explorer; and
- Investigator Berry's knowledge that people involved in the illegal sale of narcotics arrange drug deals using cell phones and that information in cell phones can help law enforcement expand its investigation into the illegal sale and distribution of narcotics in the Waterloo area.

(Doc. 26-1 at 14-15.) The above information provided sufficient probable cause that tied Defendant's cell phone to illegal narcotics sales, and specifically to the death of Ms. Wilder. The deleted incorrect information was, as Investigator Berry said, "unnecessary" to the affidavit.

I further find that Investigator Berry's false statement was not clearly critical to the finding of probable cause. As demonstrated above, the affidavit still states probable cause for issuing the warrant without inclusion of the false statement. I also find that the result would be the same if the correct information, "a skinny black male," is substituted for the incorrect information. *See Daigle*, 947 F.3d at 1083. In fact, adding this information bolsters the probable cause that already exists when the information is missing.

Therefore I find that Defendant has failed to make a substantial preliminary showing sufficient to obtain a *Franks* hearing. I recommend the District Court deny Defendant's motion for a *Franks* hearing.

### b.    Whether the **Leon** *Good Faith Exception Applies to the Warrant*

Reviewing courts should not suppress evidence seized pursuant to a search warrant, even if the reviewing court determines probable cause was absent, if the officers applying for the search warrant acted in objectively reasonable reliance on the issuance

of the warrant by a neutral magistrate. *United States v. Leon*, 468 U.S. 897, 922 (1984). Under this "good-faith exception," if a law enforcement officer's reliance on a warrant so issued was objectively reasonable, the evidence seized pursuant to the invalid warrant will not be suppressed. *United States v. Proell*, 485 F.3d 427, 430 (8th Cir. 2007). *Proell* identified four scenarios where it is not objectively reasonable for the executing officer to rely on a warrant issued by a magistrate.[15] *Id*. at 431.

Defendant argues that the search warrant affidavit "cites information gathered in violation of the Fourth Amendment (the electronic communications from September 1, 2018, that were intercepted by law enforcement). . . and the application was misleading." (Doc. 26 at 16.)

In determining whether law enforcement's reliance on a warrant was "entirely unreasonable," "[t]he court must look at the objectively ascertainable question of whether a reasonably well trained officer would have known that the search was illegal despite a judge's issuance of the warrant." *United States v. Jackson*, 784 F.3d 1227, 1231 (8th Cir. 2015) (citation omitted). *Leon* explained that "searches pursuant to a warrant will rarely require any deep inquiry into reasonableness, for a warrant issued by a magistrate normally suffices to establish that a law enforcement officer has acted in good faith in conducting the search." 468 U.S. at 922 (quotations omitted). Nevertheless, "in some circumstances the officer will have no reasonable grounds for believing that the warrant was properly issued." *Id*. at 922-23 (footnote omitted).

---

[15] "(1) when the affidavit or testimony supporting the warrant contained a false statement made knowingly and intentionally or with reckless disregard for its truth, thus misleading the issuing judge; (2) when the issuing judge 'wholly abandoned his judicial role' in issuing the warrant; (3) when the affidavit in support of the warrant is 'so lacking in indicia of probable cause as to render official belief in its existence *entirely unreasonable*'; and (4) when the warrant is 'so facially deficient' that no police officer could reasonably presume the warrant to be valid." *Proell*, 485 F.3d at 431 (citing *Leon*, 468 U.S. at 923).

47

Defendant argues that it was not objectively reasonable for law enforcement officers "to believe that posing as a dead woman, using her phone, and texting another individual in order to coax that individual into committing certain acts was legal. The undersigned has found no case law directly on point, and absent any such guidance, it is unreasonable for the officer to believe that what he did was constitutional."[16]  (Doc. 26 at 17 (citing *United States v. Conner*, 127 F.3d 663, 667 (8th Cir. 1997) (citations omitted), among others.)  For the reasons set forth above, there is no basis to conclude that posing as a dead woman or using her phone was either unconstitutional or violated the Wiretap Act.  Nevertheless, if the Court concludes otherwise, it must determine whether the *Leon* exception applies.

In *Conner*, the court suppressed evidence seized and statements made by defendants after defendants opened their motel room door in response to officers repeatedly banging on the door and demanding they open the door for the police.  948 F. Supp. at 827.[17]  The officers were acting in response to an anonymous tip that defendants possessed contraband from a burglary in a hotel room somewhere in the city.  *Id.* at 826. The tipster also said the defendants were driving a car identified by its license plate.  *Id.* Officers had located the car parked outside of the motel room.  *Id.*  Once inside the room, officers saw the contraband in plain view and obtained search warrants based on the tip and what they had observed in the room.  *Id.* at 827-28.  After finding that no exigent circumstances justified the officers' entrance into the motel room and seizure of the

---

[16] Defendant's argument has the standard reversed.  "If the method by which evidence supporting a search warrant is seized is clearly illegal, then even under *Leon* and *White*, evidence obtained under the resulting warrant should be excluded." *U.S. v. O'Neal*, 17 F.3d 239, 243 (8th Cir. 1994).  Thus, the absence of case law directly on point does not make *Leon* inapplicable. Rather, the absence of clear guidance on the issue makes it easier to conclude law enforcement action was not "clearly illegal."  *See United States v. Chen*, 99 F.3d 1495, 1500 (9th Cir. 1996) ("In our libertarian tradition, what is not prohibited is generally permitted. . . .").

[17] This is the district court opinion of the Eighth Circuit disposition cited by Defendant.  The district court opinion contains more facts and is, therefore, more useful for the instant purposes.

defendants, the court next addressed the *Leon* good faith exception and held that "[n]o officer could in good faith believe, under the facts as they existed at the time, that the defendants consented to the officers' visual or physical access to their motel room." *Id.* at 853. Thus, the court found that the *Leon* good faith exception did not apply because "[o]btaining a search warrant could not sanitize the officers' prior misconduct." *Id.* at 854. The Eighth Circuit affirmed. *Conner*, 127 F.3d 663.

For the reasons set forth above in sections III.C, *supra*, I disagree that Investigator Berry gathered information in violation of the Fourth Amendment. Moreover, even if his conduct did violate the Fourth Amendment, I find it was "close enough to the line of validity to make the officers' belief in the validity of the warrant objectively reasonable." *Id.* at 667 (citations omitted). Officers are allowed to conduct undercover work under the auspices of the Act, which is what Investigator Berry was doing. Moreover, it is universally recognized that officers may record conversations to which they are parties without obtaining a warrant. *Sileven*, 985 F.2d at 966 (citing *United States v. White*, 401 U.S. 745, 752 (1971)). These conversations were "recorded" as text messages rather than on audiotape. This is unlike the clearly unconstitutional way officers gained access to the motel room by force in *Conner*. Thus, I find Investigator Berry's pre-warrant conduct does not prevent application of the *Leon* exception. Therefore, even if I were to accept, arguendo, that the warrant was lacking probable cause, it was not "so lacking" that law enforcements officers' reliance on the warrant was "entirely unreasonable."

The good-faith exception routinely applies unless there are extreme circumstances which prevent its application. In *United States v. Herron*, for example, the good-faith exception did not apply because although there was no technical legal deficiency in the affidavits, there was "simply no evidence" in the affidavits linking the suspect to criminal activity. 215 F.3d 812, 814 (8th Cir. 2000). That is not the situation with Investigator Berry's affidavit.

*United States v. Johnson*, 332 F. Supp. 2d 35, 39 (D.D.C. 2004) is a good example of the basis for finding when the good-faith exception does not apply. *Johnson* held the good-faith exception inapplicable where (1) the affiant failed to describe when information was obtained; (2) the affiant failed to corroborate a sponsoring witness's account of events; (3) the affiant failed to obtain a statement from any witness as to suspect's residence; (4) the information giving rise to the search was stale; and (5) nexus to the location to be searched was never established. Investigator Berry's affidavit fails in none of these particulars.

*United States v. Hove*, 848 F.2d 137, 139–40 (9th Cir. 1988) found the good-faith exception inapplicable where "the affidavit offer[ed] no hint as to why the police wanted to search th[e] residence[,] . . . d[id] not link th[e] location to the defendant and . . . d[id] not offer an explanation of why the police believed they may find incriminating evidence there; the affidavit simply list[ed] the [suspect's] address as a location to be searched." Once again, Investigator Berry's affidavit cannot be criticized on any of these bases.

*United States v. Gonzales*, 399 F.3d 1225, 1231 (10th Cir. 2005) found the good-faith exception could not apply because the affidavit "completely failed to explain why [the officer] believed the items sought would be found at [suspect's residence]." Investigator Berry's affidavit is sufficient in this regard.

Finally, as detailed above in the discussion about *Franks*, the warrant affidavit was not misleading, even though Investigator Berry included incorrect information regarding how Mr. Schmitt identified Ms. Wilder's heroin supplier. Simply put, this is not an extreme scenario in which the good-faith exception is inapplicable. Thus, even if the warrant was not supported by probable cause, I find that the *Leon* good faith exception applies to the warrant.

50

### c. Whether the Warrant is Supported by Probable Cause Under a Swope *Analysis*

Defendant's arguments raise another issue that neither party briefed. Although Defendant did not explain to the Court what information in the warrant should be redacted due to alleged constitutional violations, at the hearing, some of the parties' oral argument addressed the "Eric Griggs" versus "skinny black male" language, which was just addressed above. (Doc. 46 at 4-6.) However, neither party addressed—either in briefing or in oral argument—what information should be redacted based on Defendant's assertion that the warrant contained electronic communications "intercepted by law enforcement" from September 1 in violation of the Fourth Amendment. (Doc. 26 at 16.)

Evidence acquired through a source independent of the taint of a constitutional violation is admissible. *Wong Sun v. United States*, 371 U.S. 471, 487-89 (1963). "A warrant obtained after an illegal search is not an independent source if either of the following are true: if the agents' decision to seek the warrant was prompted by what they had learned" as a result of the unconstitutional search, and if information obtained during that unconstitutional search was presented to the judge and affected the judge's decision to issue the warrant. *United States v. Swope*, 542 F.3d 609, 613 (8th Cir. 2008) (quoting *Murray v. United States*, 487 U.S. 533, 542 (1988)). In other words, two questions "must be answered in the affirmative for the warrant to be an independent source: first, would the police have applied for the warrant had they not acquired the tainted information; and second, do the application affidavits support probable cause after the tainted information has been redacted from them." *Id.* at 613-14. If removing the tainted information from the warrant removes the basis for probable cause, anything seized in the search based on the warrant must be suppressed. However, if the warrant with the information redacted still contains probable cause, any search based on the warrant was valid, barring other constitutional violations or deficiencies. *Id.* at 616-17 (finding

51

application supported probable cause when reading the untainted portions of the warrant at issue).

If the District Court disagrees with my assessment of the constitutionality of Investigator Berry's actions related to his use of Ms. Wilder's phone on September 1, then those text messages will be "tainted information" under *Swope*. The answer to the first *Swope* question is "No, the police would not have applied for the warrant for Defendant's phone without the tainted information because Defendant likely would not have been arrested on September 1 without the tainted information arranging the heroin deal." To answer the second *Swope* question, the paragraphs of the warrant affidavit that contain relevant information related to the text messages Investigator Berry exchanged with Defendant are reproduced below:

> Your affiant acting in an undercover capacity used WILDER's cell phone to arrange a meeting with GRIGGS. The following are a portion of the messages exchanged between GRIGGS and myself.
> September 1, 2018 4:01 PM
> INV. BERRY using WILDER's phone to GRIGGS (Facebook Messenger): "Hi"
> INV. BERRY using WILDER's phone to GRIGGS (Text Message): "Hi"
> INV. BERRY using WILDER's phone to GRIGGS (Text Message): "Way"
> INV. BERRY using WILDER's phone to GRIGGS (Text Message): "Wassup"
> INV. BERRY using WILDER's phone to GRIGGS (Text Message): "Need same as yesterday having a bad day"
> .  .  .
> GRIGGS to Inv. Berry using WILDER'S cell phone (Text Message): "Are u gonna be ready"
> INV. BERRY using WILDER's phone to GRIGGS (Text Message): "But I really need to get high"
> GRIGGS to Inv. Berry using WILDER'S cell phone (Text Message): "$ss"
> GRIGGS to Inv. Berry using WILDER'S cell phone (Text Message): "How much"
> INV. BERRY using WILDER's phone to GRIGGS (Text Message): "100"

INV. BERRY using WILDER's phone to GRIGGS (Text Message): "How long"

GRIGGS to Inv. Berry using WILDER'S cell phone (Text Message): "On the way"

.   .   .

GRIGGS to Inv. Berry using WILDER'S cell phone (Text Message): "I'm here:

GRIGGS to Inv. Berry using WILDER'S cell phone (Text Message): "Hello"

INV. BERRY using WILDER's phone to GRIGGS (Text Message): "I'm coming just a min can I go w u"

GRIGGS to Inv. Berry using WILDER'S cell phone (Text Message): "Yeah"

During this time your affiant contacted Waterloo Police Officer Moore to assist with contacting GRIGGS when he arrived. There were also additional officers in the area to assist with the stop. Investigator Isley had also arrived in the area to assist. During the last few messages, Investigator Isley had identified a passenger in a white Ford Explorer who he believed was GRIGGS. Investigator Isley identified the license plate as BKM-104. Investigator Isley had observed the Explorer first at the Casey's Gas Station next to PERKINS, but as a short  amount of time passed, the Explorer moved to the Perkins parking lot and parked. Officers moved in and detained the passenger Eric GRIGGS-DOB [redacted] and Joseph SCATURRO-DOB [redacted].

.   .   .

During a conversation with your affiant GRIGGS initially told your affiant he was not there to meet anyone, GRIGGS later changed his story to he was meeting a female he was wanting to have sex with. GRIGGS later told me that all of the conversations exchanged between GRIGGS and WILDER were sexual in nature and he no [sic] idea WILDER even used.

(Doc. 26-1 at 14-15 (first two sets of ellipses in original).)

I find that the warrant does not support probable cause to search Defendant's cell phone after information related to the use of Ms. Wilder's cell phone is redacted. *See* 18 U.S.C. § 2515 (When information is obtained in violation of the Act, "no part of the contents of such communication and no evidence derived therefrom may be received in

evidence in any trial."). Although Investigator Berry would obviously have wanted to obtain a search warrant for Defendant's cell phone at some time due to the text messages and Facebook Messenger messages he read when he first searched Ms. Wilder's phone, without the redacted information, Investigator Berry would not have arranged a heroin buy on September 1, would not have been at Perkins on that date, and most importantly, Investigator Isley would not have identified Defendant as Eric Griggs. Without that identification, there was nothing concrete tying Defendant to the communications found on Eric Griggs's phone. Thus, while I find that the affidavit supports probable cause to search Eric Griggs's cell phone after the tainted information has been redacted from it because the information remaining in the affidavit establishes a tie between Eric Griggs's cell phone and the heroin that likely led to Ms. Wilder's death, the September 1 drug buy and Investigator Isley's identification of Defendant was necessary to establish that Defendant was, in fact, Eric Griggs.

Accordingly, I find that if the District Court disagrees with my conclusion regarding the constitutionality of Defendant's use of Ms. Wilder's phone to send text messages to Defendant on September 1, 2018, information found on Defendant's cell phone after his arrest should be suppressed.

### 2. Whether Statements Made at the Waterloo Police Department Should be Suppressed

After Defendant was arrested, he was taken to the Waterloo Police Department and questioned by Investigator Berry and another officer.[18] (Doc. 26 at 14.) Defendant

---

[18] Defendant claims he was interviewed by Investigator Berry and another officer. (Doc. 26 at 14.) Although Investigator Berry never mentioned another officer in his testimony, he was never asked if he interviewed Defendant alone. Because Defendant was in the interview and the Government does not challenge this assertion, I will assume for purposes of this discussion that Defendant was interviewed by two officers. I will also assume that Defendant did not know the identification of the second officer because he did not identify the other officer in his brief.

argues that the statements he made during the interview must be suppressed because "they are the product of an illegal seizure of his person, and thus, are fruits of the poisonous tree requiring suppression." (*Id.*) Defendant avers that in spite of being *Mirandized* shortly after he was seized and handcuffed, he was "fundamentally under arrest at the time he was ordered removed" from the Explorer and the *Miranda* warning does not "purge the taint" of his illegal detention because his statements were not made voluntarily. (*Id.*)

The Government responds that Defendant's *Miranda* waiver was a knowing and voluntary act that was attenuated from the stop of the Explorer. Thus, Defendant's voluntary waiver of his *Miranda* rights was unaffected by the validity of the stop and seizure of Defendant.

> The exclusionary rule applies to statements that result from a Fourth Amendment violation, but a statement is not "fruit of the poisonous tree simply because it would not have come to light but for the illegal actions of police." *Wong Sun v. United States*, 371 U.S. 471, 487–88, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963). The question is whether police obtained the statement "by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Id.* at 488, 83 S. Ct. 407 (quotation omitted). "[E]xclusion may not be premised on the mere fact that a constitutional violation was a 'but-for' cause of obtaining evidence." *Hudson v. Michigan*, 547 U.S. 586, 592, 126 S. Ct. 2159, 165 L. Ed. 2d 56 (2006).

*United States v. Yorgensen*, 845 F. 3d 908, 913 (8th Cir. 2017).

The first issue is whether there was a sufficient factual nexus between the constitutional violation—Defendant's allegedly unconstitutional arrest—and the challenged evidence—statements Defendant made during his interview. *See id.*

Investigator Berry testified that it took a while for officers to reach Defendant's son's mother and then transport Defendant to the police department. Therefore, he believed he initiated his interview with Defendant at around 5:30 p.m., about an hour

after the traffic stop. (Doc. 46 at 21.) Although Defendant was not re-*Mirandized* for the interview, Investigator Berry does not believe that Defendant indicated a desire to invoke his *Miranda* rights or change his decision to waive his *Miranda* rights.[19] (*Id.*) He also testified that it was clear that Defendant understood his rights at the scene. (*Id.* at 40.) The conversation was cordial and Defendant stated that the text messages he exchanged with Ms. Wilder were text messages about he and Ms. Wilder having sex, which Ms. Wilder would pay for. (*Id.* at 22.)

I find that but-for being in custody, Defendant would not have talked to Investigator Berry. As discussed above, Defendant was only in custody as a result of the allegedly unconstitutional seizure. However, even if the District Court finds that Defendant was arrested prior to officers finding the heroin and drug paraphernalia in the Explorer, that contraband gave officers probable cause to arrest Defendant. Under *New York v. Harris*, 495 U.S. 14, 18-19 (1990), if officers have probable cause to arrest a defendant, "an initial illegal arrest does not require that the officers release and then re-arrest the defendant in order to continue with legal-custody proceedings." *United States v. Villa-Velazquez*, 282 F.3d 553, 556 (8th Cir. 2002) (applying *Harris* to the case at bar).

"The second question is whether the attenuation doctrine applies." *Yorgensen*, 845 F.3d at 914. Again, to show that statements after an illegal search or seizure were voluntary to purge the taint, courts consider (1) the "temporal proximity" between the constitutional violation and the statements, (2) intervening circumstances, (3) the "purpose and flagrancy of the official misconduct," and (4) whether *Miranda* warnings were given. *United States v. Riesselman*, 646 F.3d 1072, 1080 (8th Cir. 2011) (quotation omitted). The factors will be addressed in turn.

---

[19] Although video of the interview exists because Investigator Berry referred to it in his testimony (Doc. 46 at 21), that video is not in evidence before the Court.

### a.    Temporal Proximity

When addressing temporal proximity, a short time between the constitutional violation and the statement may be enough to indicate that the statement was voluntary if other circumstances indicate the statement was "sufficiently an act of free will to purge the primary taint." *United States v. Palacios-Suarez*, 149 F.3d 770, 772-73 (8th Cir. 1998) (holding that consent was sufficiently an act of free will to purge the taint of the initial stop where the officer asked the defendant several times if he could search the vehicle nine minutes after the initial stop) (quotation omitted); *United States v. Herrera-Gonzalez*, 474 F.3d 1105, 1112 (8th Cir. 2007) (assuming defendant's consent was given only ten minutes after illegal stop does not "compel the conclusion that the consent was insufficient to purge the taint" without analyzing other factors). Although Investigator Berry's interview of Defendant took place at about 5:30, it was not immediately after Defendant was seized.  It was enough time for Defendant to be transported to the police station, which is only a ten-minute drive according to Google Maps, and reconsider his decision to waive his *Miranda* rights before the interview commenced.  As the Supreme Court said in *Rawlings v. Kentucky*, "[a]lthough under the strictest of custodial conditions, such a short lapse of time might not suffice to purge the initial taint, we believe it necessary to examine the precise conditions" under which the defendant made his statement. 448 U.S. 98, 107-08 (1980) (discussing a 45-minute time lapse and holding that under the totality of the circumstances, defendant's statements were "acts of free will"); *see also United States v. Zarate*, No. 18-CR-2073-CJW, 2019 WL 4399515, at **18-19 (N.D. Iowa July 3, 2019) (finding attenuation with 34-minute time-lapse between violation and interview), *R. & R. adopted as modified on other grounds*, 2019 WL 3459236 (N.D. Iowa July 31, 2019).  This was not a situation in which Defendant made a statement on the heels of the constitutional violation.  I find that this factor weighs in favor of finding attenuation.

### b. Intervening Circumstances

By the time Defendant made his statements at the police station, intervening circumstances had occurred that served to purge the taint of any constitutional violation. First, the police station is far removed from the Perkins parking lot where the initial constitutional violation occurred. *See Riesselman*, 646 F.3d at 1080 (citing *United States v. Vega-Rico*, 417 F.3d 976, 980 (8th Cir. 2005)). Second, Defendant states that two officers interviewed him at the police station (Doc. 26 at 14), which means that Defendant was interviewed by someone who was not involved in violating Defendant's Fourth Amendment rights.[20] *See id.* (noting the relevance of having an officer not involved in the constitutional violation conduct the interview). Third, the interview was a "cordial conversation." (Doc. 46 at 21.) "[T]he two-sided nature of the interview weighs heavily in favor of a finding that [Defendant] acted of free will unaffected by the initial illegality." *Yorgensen*, 845 F.3d at 915 (citation omitted); *Riesselman*, 646 F.3d at 1080. Thus, this factor weighs in favor of attenuation.

### c. Purpose and Flagrancy of the Official Misconduct

> The Supreme Court places a particular emphasis on any 'purpose and flagrancy of the official misconduct' in effecting the initial [illegal arrest.]" [*United States v. Brandwein*, 796 F.3d 980, 985 (8th Cir. 2015) (quoting *Brown*, 422 U.S. at 603–04, 95 S. Ct. 2254.)] "Application of the exclusionary rule . . . does not serve [its] deterrent function when the police action, although erroneous, was not undertaken in an effort to benefit the police at the expense of the suspect's protected rights." *United States v. Simpson*, 439 F.3d 490, 496 (8th Cir. 2006) (quotation omitted). "An unreasonable mistake alone is not sufficient to establish flagrant misconduct." *United States v. Herrera–Gonzalez*, 474 F.3d 1105, 1113 (8th Cir. 2007); *see Strieff,* 136 S. Ct. at 2063.

---

[20] Investigator Berry did not mention the presence of a second officer during his testimony at the hearing. However, he was not specifically asked how many officers were present during the interview.

*Id.* (third set of brackets & ellipses in original). In the case at bar, even assuming that initially handcuffing Defendant and eventually placing him in a squad car was an arrest, officers did not do this to gain any benefit. Officers had probable cause to execute an investigatory stop. They were going to search the Explorer and find the contraband and arrest Defendant because he had no reasonable expectation of privacy in the Explorer. In thinking that handcuffing Defendant and Mr. Scaturro was necessary during the pendency of the search, officers may have made an unreasonable mistake, but the mistake did not gain the officers any benefit of the type *Brandwein* aims to avoid. 796 F.3d at 985 (officers made warrantless entry because they believed occupants were in need of assistance, not for investigative purposes). Thus, even assuming there was a premature arrest, it did not constitute a flagrant violation. This factor weighs in favor of attenuation.

### d. Miranda *Warnings*

The Government concedes that new *Miranda* warnings were not given at the police station. However, Defendant acknowledges that while the giving of *Miranda* warnings is important, it is not dispositive. (Doc. 26 at 14 (citing *Rawlings*, 448 U.S. at 107.) The Government bears the burden to prove a waiver of *Miranda* rights by a preponderance of the evidence. *Colorado v. Connelly*, 479 U.S. 157, 168 (1986). To make this determination, courts consider the following personal characteristics of the defendant:

> (1) their age; (2) their general intelligence and education; (3) whether they were intoxicated or under the influence of drugs when consenting; (4) whether they consented after being informed of their right to withhold consent or of their *Miranda* rights; and (5) whether, because they had been previously arrested, they were aware of the protections afforded to suspected criminals by the legal system.

Case 6:19-cr-02062-CJW-MAR   Document 48   Filed 10/02/20   Page 59 of 63

*Griffith*, 533 F.3d at 984 (quoting *United States v. Bradley*, 234 F.3d 363, 366 (8th Cir. 2000)) (internal citation omitted). The courts consider the following environmental characteristics in which consent to the interview was given:

> [W]hether the person who consented (1) was detained and questioned for a long or short time; (2) was threatened, physically intimidated, or punished by the police; (3) relied upon promises or misrepresentations made by the police; (4) was in custody or under arrest when the consent was given; (5) was in a public or a secluded place; or (6) either objected to the search or stood by silently while the search occurred.

*Id.* (citation omitted & bracket in original). The factors are not applied "mechanically," but only serve as guidance for the court's analysis. *Id.* A valid *Miranda* waiver must be voluntary, knowing, and intelligent. *United States v. Vinton*, 631 F.3d 476, 483 (8th Cir. 2011). A voluntary waiver is the product of "free and deliberate choice rather than intimidation, coercion, or deception." *Id.* (quoting *Moran v. Burbine,* 475 U.S. 412, 421 (1986)). A waiver is knowing and intelligent if it is made "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.*

When a defendant has been advised of his *Miranda* rights, does not sign a waiver of rights or verbally waive his rights, but proceeds to voluntarily answer questions from law enforcement, he has engaged in a "course of conduct indicating waiver" of his right to remain silent. *Berghuis v. Thompkins*, 560 U.S 370, 386 (2010) (citation omitted); *see also United States v. Washington*, 109 F.3d 459, 465 (8th Cir. 1997) (holding that defendant waived his Sixth Amendment rights by electing to answer officer's questions after being *Mirandized*) (citing *North Carolina v. Butler*, 441 U.S. 369, 373 (1979)); *United States v. Chartier*, No. CR13-0018, 2013 WL 5719483, at *11 (N.D. Iowa Aug. 16, 2013) (holding that defendant waived his right to remain silent by making "knowing, voluntary statements" to police officer after receiving *Miranda* warning), *R. & R.*

*adopted as modified*, 2013 WL 5719482 (N.D. Iowa Oct. 21, 2013) (this issue not addressed in objections to R. & R.), *aff'd*, 772 F.3d 539 (8th Cir. 2014); *United States v. Wetsch*, Crim. No. 12-0045 SRN/JJG, 2013 WL 1435228, at *29 (D. Minn. Feb. 8, 2013) (holding that defendant waived his right to remain silent by voluntarily speaking to officers, and reasoning that "the Eighth Circuit has regularly held that a custodial defendant's continued responses to question[s] after being advised of his rights constitutes a waiver") (citing *United States v. Binion*, 570 F.3d 1034, 1041 (8th Cir. 2009)), *R. & R. adopted*, 2013 WL 1435210 (D. Minn. Apr. 9, 2013).  As long as Defendant's statements were not coerced, his statements functioned as a waiver of his right to remain silent.

I find that Defendant voluntarily waived his right to remain silent and that his statements to Officer Berry were not coerced.  Although not every *Griffith* factor weighs in the Government's favor, the totality of the circumstances show that Defendant understood his *Miranda* rights and voluntarily waived them. Defendant engaged in a cordial conversation at the police station after clearly stating at Perkins that he understood his rights (Gov. Ex. 5 at 1:49), and by doing so engaged in a "course of conduct indicating waiver" of his right to remain silent.  *Berghuis*, 560 U.S at 386.

Defendant's waiver was also "knowing and intelligent" and "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it."  *Moran*, 475 U.S. at 421.  Defendant was thirty-seven years old at the time of his interview and did not appear intoxicated or under the influence of drugs or other substances when stopped by police.  Defendant appears to be of at least average intelligence and obviously understands the English language.  There is no argument or evidence that his mental abilities or English-language aptitude are impaired.  Having been previously convicted of four felonies (Doc. 8), Defendant had experience with the *Miranda* warning, his right to remain silent, and the consequences of talking to law

61

enforcement. There are no allegations that Defendant was threatened, physically intimidated, or punished by the police, or that he relied upon promises or misrepresentations made by the police. Under these circumstances, this factor weighs in favor of finding the evidence sufficiently attenuated from the violation.

Even assuming that Defendant's premature arrest weighed against finding attenuation, the other three factors weigh in favor of finding attenuation. Defendant's interview with Investigator Berry began an hour after the original violation, rather than on the heels of the violation. In addition, intervening circumstances occurred that purged the taint of the violation: Defendant was transported to a different location, had time to think for a bit before he was questioned either in the squad car or at the police station, and then engaged in a cordial conversation while an officer who was not involved in the constitutional violation was present. Finally, Defendant, who had previous experience with law enforcement, was given a valid *Miranda* warning and knowingly waived his right to counsel by speaking to officers.

### e. *Conclusion*

Based on the above analysis, I recommend that the District Court deny the part of Defendant's motion seeking to suppress the statements he made at the Waterloo Police Department.

## IV. CONCLUSION

For the reasons set forth above, I respectfully recommend the District Court **DENY** Defendant's Motion to Suppress **(Doc. 25)** and **DENY** Defendant's Oral Motion for a hearing under *Franks v. Delaware,* 438 U.S. 154 (1978). However, if the District Court finds that law enforcement's use of Defendant's cell phone on September 1, 2018 violated Defendant's constitutional rights, the District Court should **GRANT IN PART and DENY IN PART** Defendant's Motion to Suppress. **(Doc. 25.)**

**To allow for an expedited final ruling**, objections to this Report and Recommendation in accordance with 28 U.S.C. § 636(b)(1) must be filed within **SEVEN (7) days** of the service of a copy of this Report and Recommendation. *See United States v. Vasquez-Martinez*, No. 6:05CR60016-001, 2006 WL 376474, at *8 (W.D. Ark. Feb. 9, 2006) (seven days for objections); *Kato Eng'g, Inc. v. Hanley*, 367 F. Supp. 3d 918, 925 (D. Minn. 2018) (referral order included order for expedited review of R. & R.).

Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. *See* Fed. R. Crim. P. 59. Failure to object to the Report and Recommendation waives the right to *de novo* review by the district court of any portion of the Report and Recommendation as well as the right to appeal from the findings of fact contained therein. *United States v. Wise*, 588 F.3d 531, 537 n.5 (8th Cir. 2009).

**DONE AND ENTERED** at Cedar Rapids, Iowa, this 2nd day of October, 2020

Mark A. Roberts, United States Magistrate Judge
Northern District of Iowa