**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | No. 19-CR-2062-CJW-MAR |
| vs. | **ORDER** |
| ERIC DEANGELO GRIGGS, | |
| Defendant. | |

_____

**TABLE OF CONTENTS**

I.      INTRODUCTION ............................................................................. 3

II.     STANDARD OF REVIEW.................................................................. 3

III.    FACTUAL BACKGROUND ............................................................. 6

IV.     ANALYSIS....................................................................................... 9

      A.      Defendant Does Not Have Standing Under the Fourth Amendment ......11

      B.      Defendant Does Not Have Standing Under the Wiretap Act ...............14

            1.      Defendant's Text Messages Were Not Intercepted..................15

            2.      Whether the Officer's Conduct Falls Within the Act's Exception for Persons Acting Under "Color of Law"............................16

      C.      Seizure of Defendant and Subsequent Statements ...........................20

      D.      Seizure of Defendant's Cell Phone.............................................24

E.    Evidence from Defendant's Cell Phone ......................................25

    1.    *Franks* Hearing .........................................................................25

    2.    *Leon* Good Faith Exception ...............................................30

    3.    Statements Made at Waterloo Police Department ...................33

        a.    Giving of *Miranda* Warnings .....................................34

        b.    Temporal Proximity ...............................................37

        c.    Intervening Circumstances .......................................38

        d.    Purpose and Flagrancy of the Official Misconduct ..........39

V.    CONCLUSION ...............................................................................41

Case 6:19-cr-02062-CJW-MAR   Document 86   Filed 12/03/20   Page 2 of 41

# I.   INTRODUCTION

This matter is before the Court on defendant's Objections (Doc. 56) to the Report and Recommendation (Doc. 48) of the Honorable Mark A. Roberts, United States Magistrate Judge. On July 6, 2020, defendant filed a Motion to Suppress. (Doc. 25). The government timely filed a resistance. (Doc. 34). On July 29, 2020, Judge Roberts held a hearing on the motion and requested supplemental briefing from the parties. (*See* Doc. 38). On August 10, 2020, defendant filed his supplemental brief. (Doc. 40). On August 17, 2020, the government filed its supplemental brief. (Doc. 41). On October 2, 2020, Judge Roberts issued his Report and Recommendation ("R&R"), which recommends that the Court deny the Motion to Suppress. (Doc. 48). On October 9, 2020, defendant timely filed his objections to the R&R. (Doc. 56).

For the following reasons, the Court **sustains** defendant's objection No. 1, **overrules** defendant's objections Nos. 2–11, **adopts** Judge Roberts' R&R with minor factual modification, and **denies** defendant's Motion to Suppress.

# II.   STANDARD OF REVIEW

The Court reviews Judge Roberts' R&R under the statutory standards found in Title 28, United States Code, Section 636(b)(1):

> A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

*See also* FED. R. CIV. P. 72(b) (stating identical requirements). While examining these statutory standards, the United States Supreme Court explained:

> Any party that desires plenary consideration by the Article III judge of any issue need only ask. Moreover, while the statute does not require the judge to review an issue de novo if no objections are filed, it does not

3

> preclude further review by the district judge, sua sponte or at the request
> of a party, under a de novo or any other standard.

*Thomas v. Arn*, 474 U.S. 140, 154 (1985). Thus, a district court may review de novo any issue in a magistrate judge's report and recommendation at any time. *Id.* If a party files an objection to the magistrate judge's report and recommendation, the district court must review the objected portions de novo. 28 U.S.C. § 636(b)(1). In the absence of an objection, the district court is not required "to give any more consideration to the magistrate [judge]'s report than the court considers appropriate." *Thomas*, 474 U.S. at 150.

De novo review is non-deferential and generally allows a reviewing court to make an "independent review" of the entire matter. *Salve Regina Coll. v. Russell*, 499 U.S. 225, 238 (1991); *see also Doe v. Chao*, 540 U.S. 614, 620–19 (2004) (noting de novo review is "distinct from any form of deferential review"). The de novo review of a magistrate judge's report and recommendation, however, only means a district court "'give[s] fresh consideration to those issues to which specific objection has been made.'" *United States v. Raddatz*, 447 U.S. 667, 675 (1980) (quoting H.R. Rep. No. 94–1609, at 3, reprinted in 1976 U.S.C.C.A.N. 6162, 6163 (discussing how certain amendments affect Section 636(b))). Thus, although de novo review generally entails review of an entire matter, in the context of Section 636 a district court's required de novo review is limited to "de novo determination[s]" of only "those portions" or "specified proposed findings" to which objections have been made. 28 U.S.C. § 636(b)(1).

Consequently, the Eighth Circuit Court of Appeals has indicated de novo review would only be required if objections were "specific enough to trigger de novo review." *Branch v. Martin*, 886 F.2d 1043, 1046 (8th Cir. 1989). Despite this "specificity" requirement to trigger de novo review, the Eighth Circuit Court of Appeals has "emphasized the necessity . . . of retention by the district court of substantial control

4

over the ultimate disposition of matters referred to a magistrate [judge]." *Belk v. Purkett*, 15 F.3d 803, 815 (8th Cir. 1994). As a result, the Eighth Circuit Court of Appeals has concluded that general objections require "full de novo review" if the record is concise. *Id.* Even if the reviewing court must construe objections liberally to require de novo review, it is clear to this Court that there is a distinction between making an objection and making no objection at all. *See Coop. Fin. Ass'n, Inc. v. Garst*, 917 F. Supp. 1356, 1373 (N.D. Iowa 1996).

In the absence of any objection, the Eighth Circuit Court of Appeals has indicated a district court should review a magistrate judge's report and recommendation under a clearly erroneous standard of review. *See Grinder v. Gammon*, 73 F.3d 793, 795 (8th Cir. 1996); *see also Taylor v. Farrier*, 910 F.2d 518, 520 (8th Cir. 1990) (noting the advisory committee's note to Federal Rule of Civil Procedure 72(b) indicates "when no timely objection is filed the court need only satisfy itself that there is no clear error on the face of the record"); *Branch*, 886 F.2d at 1046 (contrasting de novo review with "clearly erroneous standard" of review, and recognizing de novo review was required because objections were filed).

The Court is unaware of any case that has described the clearly erroneous standard of review in the context of a district court's review of a magistrate judge's report and recommendation to which no objection has been filed. In other contexts, however, the Supreme Court has stated the "foremost" principle under this standard of review "is that '[a] finding is "clearly erroneous" when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *Anderson v. City of Bessemer City*, 470 U.S. 564, 573–74 (1985) (citation omitted). Thus, the clearly erroneous standard of review is deferential, *see Dixon v. Crete Med. Clinic, P.C.*, 498 F.3d 837, 847 (8th Cir. 2007), but a district court may still reject the magistrate judge's report and recommendation

when the district court is "left with a definite and firm conviction that a mistake has been committed." *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948).

Even though some "lesser review" than de novo is not "positively require[d]" by statute, *Thomas*, 474 U.S. at 150, Eighth Circuit precedent leads this Court to believe that a clearly erroneous standard of review should generally be used as the baseline standard to review all findings in a magistrate judge's report and recommendation that are not objected to or when the parties fail to file any timely objections, *see Grinder*, 73 F.3d at 795; *Taylor*, 910 F.2d at 520; *Branch*, 886 F.2d at 1046; *see also* FED. R. CIV. P. 72(b) advisory committee's note ("When no timely objection is filed, the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation."). In the context of the review of a magistrate judge's report and recommendation, the Court believes one further caveat is necessary: a district court always remains free to render its own decision under de novo review, regardless of whether it feels a mistake has been committed. *See Thomas*, 474 U.S. at 153–54. Thus, although a clearly erroneous standard of review is deferential and the minimum standard appropriate in this context, it is not mandatory, and the district court may choose to apply a less deferential standard.

## III.   FACTUAL BACKGROUND

Defendant objects to one of Judge Roberts' factual findings, namely, the finding that "defendant agreed to deliver heroin to Investigator Berry apparently believing he was Ms. Wilder." (Doc. 56, at 1). After reviewing the record, the Court finds that this finding is conclusory of a matter still at issue and therefore declines to adopt that specific finding. Judge Roberts otherwise accurately and thoroughly summarized the relevant facts in his R&R. (Doc. 48, at 4–7). Thus, the Court adopts and incorporates the R&R's factual findings with minor modification.

6

On the evening of August 31, 2018 ("August 31"), Abigail Wilder talked to her boyfriend Jeffrey Schmitt on the phone four times, the last time at 8:55 p.m. Mr. Schmitt was incarcerated in the Black Hawk County Jail and their calls were recorded on the Black Hawk County Jail recording system.

During an 8:04 p.m. phone call, Ms. Wilder told Mr. Schmitt that she was driving to Dewar, Iowa to "get it" and to pick up her supplier. (Doc. 26-1 at 13.) She then took her supplier back to a house in Waterloo, Iowa. During an 8:38 p.m. call, Ms. Wilder told Mr. Schmitt that she had just dropped off her supplier and was returning home. Ms. Wilder spoke to Mr. Schmitt for the final time at approximately 8:55 p.m. as she was arriving home. Mr. Schmitt asked what took her so long, and Ms. Wilder said her supplier "had to sell to someone else so I had to stay in the car" and then drive her supplier to the east side of town. (*Id.* at 14.) Mr. Schmitt cautioned Ms. Wilder to "be safe[.] I've been worried you can always do more. . . . I'm talking about the H[;] don't do too much at one time." (*Id.*)

Ms. Wilder went into the basement of the home she and Mr. Schmitt shared with Mr. Schmitt's mother, used the heroin she had just purchased from her supplier, and died.

On September 1, 2018 ("September 1"), Cedar Falls police were called to the home where Ms. Wilder had been found dead with a spoon and some heroin on a night stand next to her body and an uncapped syringe and pink iPhone in plain view.[2] Ms. Wilder had lived in the basement of the residence with Mr. Schmitt. Kara Schmitt, Mr. Schmitt's mother, lived upstairs of the residence. The Waterloo Police Department was contacted and Investigator Nicholas Berry and Investigator Isley responded. Investigator Berry obtained a search warrant for Ms. Wilder's cell phone, among other things. (Doc. 34-1.) At about the time Investigator Berry obtained the search warrant, Investigator Isley went to speak to Mr. Schmitt at the jail and Mr. Schmitt gave Investigator Isley the code to unlock Ms. Wilder's cell phone. The phone was unlocked in Mr. Schmitt's presence.

During his interview with Mr. Schmitt, Investigator Isley learned that Ms. Wilder would communicate with her heroin supplier via Facebook Messenger and text messages. Mr. Schmitt also told Investigator Isley that he did not know the name of Ms. Wilder's supplier, but he was a "skinny black male" and would "probably be the last person that Abigail spoke to on Facebook messenger, as that is how she usually contacted him." (Doc. 26-1 at 1.)

7

When Investigator Berry searched Ms. Wilder's phone pursuant to the warrant, he found "drug-related communications" between her Facebook Messenger account and a Facebook Messenger account associated with the name "Eric Griggs." (Doc. 34-2; Doc. 46 at 13.) Both Investigator Isley and Investigator Berry had worked on the task force for years and the name "Eric Griggs" had come up before in their work. Investigator Berry testified that he believed he and Investigator Isley looked at Defendant's Facebook page associated with his Messenger account and at photos of Defendant. (Doc. 46 at 12.)

Ms. Wilder would also text Defendant and make audio calls to Defendant. It also became apparent to law enforcement that text messages, messages exchanged between Ms. Wilder's Messenger account and Defendant's Messenger account on the last day Ms. Wilder was alive "kind of coincided with" Ms. Wilder "meeting with [Defendant] to obtain narcotics." (*Id.* at 14.)

Shortly after 4:00 p.m. on September 1, Investigator Berry began using Ms. Wilder's phone to send text messages and Facebook Messenger messages to Defendant in an undercover capacity. He reached out to Defendant on both platforms and tried to replicate the situation that occurred the previous night when he suspected Ms. Wilder purchased heroin from Defendant. Defendant responded to text messages and that is the form of communication Investigator Berry used with Defendant from then on. Ultimately, Defendant agreed to deliver heroin to Investigator Berry apparently believing he was Ms. Wilder. Investigator Berry testified that he believed Defendant's intentions were to supply Ms. Wilder with heroin. Investigator Berry set up a situation in which "Ms. Wilder" would be eating at a Perkins restaurant with her mother and then Defendant would pick her up. At 4:35 p.m., Defendant texted Investigator Berry that he was at the Casey's gas station directly adjacent to the Perkins. Investigator Isley was in the Casey's lot at the time and observed a white Ford Explorer arrive in the lot. The text message Defendant sent coincided with the arrival of the Explorer. In addition, Investigator Isley identified a person he believed was Defendant in the passenger seat of the Explorer. The Explorer drove into the Perkins parking lot and parked.

At that point, marked patrol units from the Waterloo Police Department approached the Explorer. (Gov. Exs. 4, 5.) Defendant, who had his cell phone in his hand, was asked to step out of the vehicle and he complied. Both Defendant and Joseph Scaturro, who was driving, were detained and handcuffed. Defendant was immediately Mirandized and

searched. (Gov. Ex. 5 at 1:21-2:59.) Defendant stated that he understood his rights. (*Id.* at 1:49.) Mr. Scaturro was also searched. (*Id.* at 6:00.) Both Defendant's and Mr. Scaturro's cell phones were seized. Law enforcement eventually obtained a warrant to search Defendant's cell phone. During the stop, Defendant gave consent to an officer to go into his phone and find the phone number for the mother of his son, who was in the backseat of the Explorer at the time.

Defendant eventually admitted he was in the Perkins lot to meet Ms. Wilder, but said he was there to have sex with her. The Explorer belonged to Mr. Scaturro, who gave officers permission to search the vehicle. Inside the Explorer, officers found a plastic baggie with a substance later identified as heroin and a syringe with a cap on it.

*Id.* (original footnotes omitted).

## IV. ANALYSIS

In his Motion to Suppress, defendant argued that his September 1, 2018 text communications with law enforcement were "akin to an illegal wiretap" and should thus be suppressed. (Doc. 26, at 3–7; Doc. 40, at 1–9). Defendant also argued that the stop and search of Mr. Scaturro's vehicle and subsequent seizure of defendant violated the Fourth Amendment. (Doc. 26, at 7–13). Defendant further argued that the statements he made at the Waterloo Police Department and the information in his cell phone should be suppressed as the fruit of the unlawful search and seizure. (*Id.*, at 13–17).

Judge Roberts found that defendant did not have standing under the Fourth Amendment to seek suppression of the September 1, 2018 text messages on Ms. Wilder's cell phone. (Doc. 48, at 9 –14). Judge Roberts also found that defendant did not have standing under the Wiretap Act (the "Act"). (*Id.*, at 15–20). In the alternative, Judge Roberts found that even if defendant did have standing under the Act, the Act does not provide a suppression remedy for the September 1, 2018 text communications because Investigator Berry's conduct falls within the Act's exception. (*Id.*, at 20–27). Judge Roberts also found that the approach of Mr. Scaturro's vehicle, seizure of defendant,

9

seizure of defendant's cell phone, and arrest of defendant were all reasonable within the Fourth Amendment. (*Id.*, at 27–39). Judge Roberts further found that defendant failed to make a substantial preliminary showing sufficient to obtain a *Franks* hearing. (*Id.*, at 40–46). Judge Roberts found that even if the warrant was not supported by probable cause, the *Leon* good faith exception applies to the warrant. (*Id.*, at 46–50). Judge Roberts additionally found that if this Court disagreed with his conclusion regarding the constitutionality of the use of Ms. Wilder's phone to send the September 1, 2018 text messages to defendant, then the information found on defendant's cell phone after his arrest should be suppressed. (*Id.*, at 51–54). Finally, Judge Roberts found that defendant's statements at the Waterloo Police Station were sufficiently attenuated from the alleged initial Fourth Amendment violation and therefore should not be suppressed. (*Id.*, at 54–62).

Defendant has the following objections to the Report and Recommendation: (1) Judge Roberts' factual finding that defendant "agreed to deliver heroin to Investigator Berry apparently believing he was Ms. Wilder," (2) that defendant does not have standing under the Fourth Amendment to seek suppression of the September 1, 2018 text communications, (3) that defendant does not have standing under the Wiretap Act, (4) that Investigator Berry's conduct fell within the Act's exception for persons acting under color of law who are "a party to the communication," (5) the broad conclusion that defendant is not entitled to suppression of evidence under the Act, (6) the broad conclusions that officers had reasonable suspicion to approach Mr. Scaturro's vehicle, that the stop and search of defendant was reasonably related in scope to the circumstances that justified the stop, that the seizure of defendant's cell phone was justified, and there was probable cause to arrest defendant, (7) the conclusion that defendant failed to make a preliminary showing sufficient to obtain a *Franks* hearing, (8) the conclusion that omitting the false information in the search warrant addendum would not have altered a finding of probable

cause, (9) that the *Leon* good faith exception applies to the warrant for defendant's phone, and (10) that the attenuation doctrine applies and thus defendant's statements should not be suppressed. (Doc. 56, at 1–9).

### A. *Defendant Does Not Have Standing Under the Fourth Amendment*

Judge Roberts found that defendant does not have standing under the Fourth Amendment to seek suppression of the September 1, 2018 text messages exchanged with Investigator Berry. (Doc. 48, at 14). Defendant objects to this conclusion, asserting that he has standing under the Fourth Amendment because "he had a reasonable expectation of privacy in his text communications with [the victim], and with the person he reasonably believed to be [the victim] (Berry)." (Doc. 56, at 2). Defendant further objects to the conclusion that his expectation to privacy evaporated because Investigator Berry was "impersonating" the person he thought he was communicating with. (*Id.*). Defendant states that even though one may assume the risk of the counterparty revealing private text messages to others, it is reasonable for one to rely on the assumption that the "counterparty in the text message conversation has not died and been replaced by government agents." (*Id.*).

"To contest the validity of a search, a person must have a reasonable expectation of privacy in the place searched. Fourth Amendment rights are personal and may not be vicariously asserted. With regard to the content of cell phones, an accused must first establish that he personally has a legitimate expectation of privacy in the object that was searched." *United States v. Turner*, 781 F.3d 374, 382 (8th Cir. 2015) (internal quotations and citations omitted) (holding that the defendant did not have a legitimate expectation of privacy in the phones because he did not "own[ ], possess[ ], or use[ ] either of the[ ] cell phones").

Defendant cites several cases in support of his objection, starting with *Quon v. Arch Wireless Operating Co.*, 529 F.3d 892 (9th Cir. 2008). The *Quon* court asserts that

"users do have a reasonable expectation of privacy in the content of their text messages vis-a-vis the service provider." *Quon*, 529 F.3d at 905 (finding that defendant had a reasonable expectation of privacy in his messages sent on a messaging service supplied via a work device). As defendant notes, however, *Quon* explicitly states that there is "no reasonable expectation that [plaintiff] would maintain the private nature of their text messages, or vice versa," and that it "is necessarily a context-sensitive inquiry." *Id.* at 906. Defendant also cites *United States v. Finley*, 477 F.3d 250 (5th Cir. 2007), where the court held that the defendant did have a reasonable expectation of privacy in the text messages on a work issued cell-phone. *Id.* at 259 ("That Finley's employer could have read the text messages once he returned the phone does not imply that a person in Finley's position should not have reasonably expected to be free from intrusion from both the government and the general public.").[1]

This Court does not find *Quon* or *Finley* particularly persuasive as the facts here are significantly different. In both *Finley* and *Quon*, the defendant was actively using a device or messaging service provided by an employer, and the issue is whether the defendant has a reasonable expectation of privacy on that device or within a service used on that device that they possessed. In both of those cases, the courts found there was a reasonable expectation of privacy. The Eighth Circuit, however, requires that the device in question be owned, possessed, or used by the defendant. *See Turner*, 781 F.3d at 382. The record does not support that defendant ever owned, possessed or used the decedent's cell phone.

---

[1] The third case cited by defendant, *United States v. Banks*, No. 5:13-CR-40060-DDC, 2014 WL 4261344 (D. Kan. Aug. 29, 2014), is irrelevant to the analysis here. The court there did not address the Fourth Amendment question in their analysis, but rather just assumed defendants had established an expectation of privacy in their text messages so the court could conduct a more in-depth analysis on a different legal issue.

12

Instead, this Court finds *United States v. Bereznak*, No. 3:18-CR-39, 2018 WL 1993904 (M.D. Pa. Apr. 27, 2018), and *United States v. Mack*, 53 F. Supp.3d 179 (D.D.C. 2014), more factually relevant to this case. The defendant in *Bereznak* sought to suppress messages he sent to the decedent, arguing that he had expected that only the decedent would read them. *Bereznak*, 2018 WL 1993904, at *2. The *Bereznak* court held that by sending the text messages, the defendant had "assumed the risk that [the recipient] would reveal the messages or their contents to others" and thus "cannot now claim [the defendant] has a reasonable expectation of privacy in the content of the messages stored on [the recipient's] phone." *Id. See also Smith v. Maryland*, 442 U.S. 735, 743–44 (1979) ("[A] person has no legitimate expectation of privacy in information he voluntarily turns over to third parties."); *United States v. Miller*, 425 U.S. 435, 443 (1976) ("[A defendant] takes the risk, in revealing his affairs to another, that the information will be conveyed by that person to the Government.")). Here, defendant contends that he did not reasonably expect the recipient of the messages to pass away and be replaced with the police. (Doc. 40, at 7.) Nevertheless, following the reasoning of *Bereznak*, if defendant assumed the risk, it does not matter with whom he thought he was communicating. By sending the message, he assumed the risk that the message could be read by a third party, and thus did not have a reasonable expectation of privacy in the contents of that third party's phone.

In *Mack*, undercover officers reached out to the defendant who willingly exchanged text messages with them to organize a drug deal. *Mack*, 53 F. Supp. 3d at 186. There, the court found that the "[d]efendant did not have a legitimate expectation of privacy in the messages he willingly, and without undue Government prompting, sent to the undercover officers." *Id.* In *Mack*, the defendant may have assumed that the person he communicated with was not an undercover officer, but the court did not find that relevant to the issue of his reasonable expectation of privacy. So too here. Defendant

13

willingly sent text messages to the undercover officers. The fact that he assumed that they were not undercover officers does not give him a reasonable expectation of privacy in the text messages he voluntarily sent.

Although factually different, *United States v. Sileven*, 985 F.2d 962 (8th Cir. 1993), is informative because there the Eighth Circuit Court of Appeals found that the Fourth Amendment did not protect the defendant's recorded conversations with government agents who had assumed fictitious identities just because defendant was deceived. "The Fourth Amendment does not protect a wrongdoer's misplaced belief that a person to whom he voluntarily confides his wrongdoing will not reveal it." *Id.* at 966 (citing *Hoffa v. United States*, 385 U.S. 293, 302 (1966)). Here, defendant was sending text messages, while in *Sileven*, the defendant was meeting the undercover officers face to face. In both situations, however, the defendant argued that he reasonably expected not to be conversing with undercover officers. The Eighth Circuit found that this belief does not warrant Fourth Amendment privacy protection and this Court agrees. Thus, this Court agrees with Judge Roberts' recommendation and finds that defendant did not personally have an expectation of privacy in the decedent's cell phone, and by extension the text messages he sent to that cell phone. This Court also does not find persuasive the fact that defendant did not know that the person he was communicating with was an undercover officer, because he willingly sent the text messages. Thus, this Court finds that defendant does not have standing under the Fourth Amendment to seek suppression of the text messages exchanged with Investigator Berry on September 1, 2018. Defendant's objection on this ground is **overruled**.

### B.    *Defendant Does Not Have Standing Under the Wiretap Act*

Judge Roberts found that defendant does not have standing under the Wiretap Act to seek suppression of the September 1, 2018 text messages exchanged with Investigator Berry. (Doc. 48, at 20). Defendant objects to this conclusion, and more specifically to

the conclusion that his messages were not intercepted within the Act's definition of "intercept." (Doc. 56, at 2–3). Defendant further objects to the conclusion that Investigator Berry's actions did not count as interception under the term's definition within the Act. (*Id.*).

### 1. Defendant's Text Messages Were Not Intercepted

To have standing under the Wiretap Act, defendant must have been both (1) an "aggrieved person" under the Act and (2) the September 1, 2018 text messages must have been "intercepted" under the Act. *See In re Berry*, 521 F.2d 179, 185 (10th Cir. 1975).

The Act defines an "aggrieved person" as "a person who was a party to any intercepted wire, oral, or electronic communication or a person against whom the interception was directed." 18 U.S.C. § 2510(11). Judge Roberts found that defendant is an "aggrieved person" under the Act and defendant does not object. (Doc. 48, at 15–17; Doc. 56, at 2). This Court agrees with Judge Roberts that defendant is an "aggrieved person" under the Act.

The Act defines "intercept" as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4). The term "electronic communication" is defined as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by [various means]." *Id*. § 2510(12). The phrase 'electronic, mechanical, or other device' applies to

> any device or apparatus which can be used to intercept a wire, oral, or electronic communication *other than (a) any telephone* or telegraph instrument, equipment of facility, or any component thereof . . . being used . . . by an investigative or law enforcement officer in the ordinary course of his duties.

*Id*. § 2510(5) (emphasis added).

"In construing a statute, we look first to the plain meaning of the words of the statute." *United States v. Smith*, 171 F.3d 617, 620 (8th Cir. 1999) (citations omitted). Analyzing the plain language of the Act, the officer did not "intercept" the communications.

In making this determination, the Court first analyzes whether the text messages were an electronic communication. Neither party appears to dispute that the texts were an electronic communication and case law seems to support this conclusion. (*See* Doc. 48, at 16 (compiling cases)). Thus, this Court finds the text messages were an electronic communication under the Act.

Next, the Court determines what kind of device was used. A phone was used here for the electronic communication between the law enforcement officer and defendant. The Act explicitly states that a phone being used by a law enforcement officer in the ordinary course of his duties is an exception to the device definition under the Act. Neither party appears to dispute that the officer was acting in the ordinary course of his duties. Because the device used is an exception to the definition of device and no other device was used to obtain the contents of the messages, the definition of intercept is not satisfied by the facts here. Thus, under the plain language of the Act, the officer did not "intercept" the communications.

### 2. Whether the Officer's Conduct Falls Within the Act's Exception for Persons Acting Under "Color of Law"

Alternatively, even if the investigator had intercepted the messages within the meaning of the Act, however, his conduct falls under the Act's exception for persons acting under color of law. Judge Roberts found that Investigator Berry's conduct fell within the Act's exception because he was a party to the conversation and was acting under color of law when he impersonated Ms. Wilder in the September 1, 2018 text

messages he exchanged with defendant. (Doc. 48, at 25–26). Defendant objects to this conclusion. (Doc. 56, at 3).

The relevant portion of the statute states that "[i]t shall not be unlawful under this chapter for a person acting under color of law to intercept a wire, oral, or electronic communication, where such person is a party to the communication or one of the parties to the communication has given prior consent to such interception." 18 U.S.C.A. § 2511(2)(c). The Court must therefore first determine whether the investigator was acting under color of law and whether he was a party to the communication.

In support of his objections that the investigator was not acting under color of law, defendant cites *United States v. Kim*, 803 F. Supp. 352 (D. Haw. 1992, *aff'd*, 25 F.3d 1426 (9th Cir. 1994) (suppressing contents of phone conversations that transpired after officer answered defendant's phone seized under forfeiture law). The Court does not find defendant's reading of *Kim* persuasive, however, given the significantly different facts here.

In *Kim*, the phone the officer answered belonged to the defendant. *Id.* at 361. The officers seized the device under federal forfeiture law but did not have a warrant to search the contents of the device. *See id.* at 361–62. The device in *Kim* "was not seized for any investigatory purpose" and thus, without a warrant, the court could not conclude that the investigators had authority to intercept the phone calls. *Id.* at 362.

*Kim* also established a general rule that "when agents are conducting a legitimate search pursuant to a warrant, they may intercept telephone calls if such is within the scope of the search as set forth by the terms of the warrant." *Id.* (citing *United States v. Ordonez,* 737 F.2d 793 (9th Cir. 1984)). "[A]n officer may intercept telephone calls while executing a search warrant if the calls are *reasonably related* to the purpose of the search." *Id.* (citation omitted) (emphasis added).

In differentiating *Kim*, the phone answered here did not belong to defendant. Defendant therefore had no expectation of privacy in it. Further, the investigator here searched the phone under a warrant for the purpose of investigating the victim's death—more specifically to investigate the person with whom the victim had been in contact to obtain narcotics. (Doc. 34-1, at 5). The warrant was based on an affidavit detailing how the search of an overdose victim's phone can assist investigators in identifying the drug supplier and sellers, how cell phones are used to arrange drug transactions, how those transactions take place via text messages, how those conversations can allow investigators to identify additional members of the drug organization. *Id.* Once the phone was opened under the warrant, and the investigators recognized defendant's name and tied him to the victim's last conversation, communicating with defendant on that device was reasonably related to the investigation. Thus, even though the officers were sending an outgoing text rather than answering an incoming phone call, the warrant and affidavit satisfy the general rule established in *Kim*.

*Kim* further stated that the purpose of the Act's exception is "to take legitimate undercover work outside the scope of the wiretapping statute." *Kim*, 803 F. Supp. at 362. In *Kim*, the officer was not working in an undercover capacity, while the investigator here was. The Eighth Circuit Court of Appeals generally finds that officers are acting under color of law when doing so at the direction of law enforcement or government investigators. *See generally United States v. Lora-Andres*, 844 F.3d 781, 784–85 (8th Cir. 2016); *United States v. Rich*, 518 F.2d 980, 985 (8th Cir. 1975). Thus, the investigators here were acting under color of law.

Next, this Court must determine whether the investigator was a party to the communication. Defendant argues that the investigator was not a party "because he disguised his identity in a way that evidently fooled [defendant], or would reasonably have fooled a person in [defendant's] position." (Doc. 40, at 2). Again, defendant cites

*Kim* in support of this position, but the Court finds *United States v. Pasha*, 332 F.2d 193 (7th Cir. 1964), more persuasive. *Pasha* involved an officer answering the phone in the defendant's apartment and impersonating him to the callers. *Id.* at 196. The court found that there was no interception because the officer was a party to the communication even though the caller was fooled by the officer. *Id.* at 198. "[T]he officer was the immediate party to the call. The [caller] intended his words to reach the officer, albeit the [caller] thought he was someone else. Thus the officer did not 'intercept' a message while it was en route to another; there was no other on the line." *Id.* (citation omitted).

The legislative history of the Act also sheds light onto the meaning of 'party' and whether the *Pasha* construction should be followed. According to the Senate Judiciary Committee's comments on this Act, a "'party' would mean the person actually participating in the communication. (*United States v. Pasha*, 332 F.2d 193 (7th Cir. 1964))." *United States v. Campagnuolo*, 592 F.2d 852, 863 (5th Cir. 1979) (quoting S.Rep.No.1097, 90th Cong.2d Sess. (1968), Reprinted in (1968) 2 U.S. Code Cong. & Admin. News, pp. 2112, 2182). Defendant's argument that the Court should not rely on *Pasha* because it was decided before the Wiretap Act was enacted (Doc. 40, at 4) is unpersuasive because Congress explicitly cited *Pasha* when defining "party." The Court agrees with the Fifth Circuit Court of Appeals that "[i]t is clear from this passage that Congress intended to reaffirm the result in *Pasha* . . .."). *Campagnuolo*, 592 F.2d, at 863. *See also Clemons v. Waller*, 82 F. App'x 436, 442 (6th Cir. 2003) ("By citing *Pasha*, Congress strongly intimated that one who impersonates the intended receiver of a communication may still be a party to that communication for the purposes of the federal wiretap statute and that such conduct is not proscribed by the statute."). Thus, the investigator was a party to the conversation, because he was the person actually participating in the communication.

As discussed above, the investigator did not intercept the communication. Further, his conduct falls within the Act's exception for persons acting under "color of law" who are a party to the communication. Defendant's objection on this ground is **overruled**.

### C. *Seizure of Defendant and Subsequent Statements*

Judge Roberts found that the officers' approach of Mr. Scaturro's vehicle, the initial seizure of defendant, the seizure of defendant's cell phone, and the subsequent arrest of defendant were all reasonable within the context of the Fourth Amendment. (Doc. 48, at 39). Defendant objects to these conclusions, asserting that officers had no way of knowing that defendant was the same "Eric Griggs" who had communicated with Ms. Wilder and thus lacked the reasonable suspicion necessary to seize defendant from Scaturro's vehicle. (Doc. 56, at 6). Defendant further contends that Judge Roberts erred in finding that officers possessed the probable cause necessary to search Scaturro's vehicle, arrest defendant, and seize defendant's cell phone because "[t]hese findings . . . hinge on whether law enforcement had a reasonable suspicion that [defendant] was the person selling heroin." (*Id.*). Defendant's analysis is incorrect here.

The Eighth Circuit recognizes three classes of police encounters: "(1) consensual communications involving no coercion or restraint, (2) *Terry* stops—minimally intrusive seizures that are significant enough to invoke the Fourth Amendment and must be supported by reasonable suspicion, and (3) full-scale arrests that must be supported by probable cause." *United States v. Flores-Sandoval*, 474 F.3d 1142, 1144–45 (8th Cir. 2007) (citing *Terry v. Ohio*, 392 U.S. 1, 20 (1968); *United States v. Johnson*, 326 F. 3d 1018, 1021 (8th Cir. 2003)). "Law enforcement officers do not violate the Fourth Amendment's prohibition of unreasonable seizures merely by approaching individuals on the street or in other public places and putting questions to them if they are willing to listen." *United States v. Drayton*, 536 U.S. 194, 200 (2002) (citations omitted).

The touchstone for determining when a consensual encounter is transformed into a seizure is whether "a reasonable person would feel free to terminate the encounter." *United States v. Lopez-Mendoza*, 601 F.3d 861, 865 (8th Cir. 2010) (quoting *Drayton*, 536 U.S. at 201). "A person is seized by the police and thus entitled to challenge the government's action under the Fourth Amendment when the officer, by means of physical force or show of authority, terminates or restrains his freedom of movement through means intentionally applied." *Brendlin v. California*, 551 U.S. 249, 254 (2007) (internal citations, quotations, and emphasis omitted). To prove that a seizure occurred as a result of a show of authority rather than physical force, a defendant must demonstrate that there was in fact a show of authority and that the defendant actually submitted to that show of authority. *Id.* Whether a law enforcement officer exercised a show of authority is a fact intensive inquiry and is determined by the "totality of the circumstances surrounding the incident." *Johnson*, 326 F.3d at 1021. Some relevant factors to be considered by the Court include the number of officers present, display of a weapon by an officer, physical touching of the person by the officer, use of strong language or tone of voice, whether police impeded a person's egress, or whether the person attempted to leave. *United States v. Griffith*, 533 F.3d 979, 983 (8th Cir. 2008) (citations omitted). This inquiry is "necessarily imprecise, because it is designed to assess the coercive effect of police conduct, taken as a whole, rather than to focus on particular details of that conduct in isolation." *Michigan v. Chesternut*, 486 U.S. 567, 573 (1988).

As an initial matter, officers needed neither probable cause nor reasonable suspicion to merely approach defendant. Because a person in a public space generally does not have a reasonable expectation of privacy, officers are free to approach, observe, or make note of anything that a person does if observable from a place the officer has a legal right to be. *See Florida v. Riley*, 488 U.S. 445, 451–52 (1989) (holding that officers in helicopter 400 feet above defendant's property observing marijuana plants in

defendant's curtilage did not violate Fourth Amendment); *United States v. Delaney*, 52 F.3d 182, 188 (8th Cir. 1995) (finding that officer observing defendant through gap in stall door of public restroom when defendant knew officer was there did not violate Fourth Amendment). Prior to being approached by officers, defendant had driven on public thoroughfares and was parked in a publicly accessible parking lot. Investigators Isley and Berry had a legal right to be where they were when they initially observed defendant. That Investigator Isley was not completely certain of defendant's identity prior to approaching is not material to the question of whether officers had a right to approach defendant. So far as the Fourth Amendment is concerned, officers could have approached and requested defendant's identification without any amount of reasonable suspicion. *Florida v. Bostick*, 501 U.S. 429, 434 (1991) ("even when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual" or request an individual's identification) (citations omitted). Thus, defendant's objection that officers here lacked reasonable suspicion to even approach defendant is inapposite.

Officers here did not merely approach defendant, however. Marked police cars quickly converged on Mr. Scaturro's vehicle from the front and rear. (Gov't Ex. 4). Officers exited their vehicles, ordered defendant to stay in the vehicle and to put his hands up. *Id.* Officers then removed defendant from the vehicle, ordered him to place his hands behind his back, restrained him with handcuffs, and expressly informed him that he was being detained. *Id.* All of this occurred in the span of approximately 30 seconds. *Id.* The restraint on defendant's liberty was rapid and intentional. Defendant was unquestionably seized within the meaning of the Fourth Amendment. *See United States v. Mendenhall*, 446 U.S. 544, 554 (1980) (describing a seizure as a restriction on freedom of movement by means of physical force or show of authority). This is not a case where officers initiated a consensual encounter which developed into a seizure based on

observations made during the encounter.  This seizure took the form of a full-scale arrest as described in *Flores-Sandoval*.  *Flores-Sandoval*, 474 F.3d at 1144–45.

Further, it was plainly the officers' intent to seize defendant before they made contact with him.  The question is not whether officers possessed reasonable suspicion sufficient to justify an investigatory stop or a protective frisk.  Rather, the question is whether officers had probable cause sufficient to justify a warrantless arrest of defendant.  Judge Roberts found that the seizure of defendant here was justified by the circumstances—albeit in the context of a reasonable suspicion analysis.  The Court agrees with his rationale and extends it.  Officers here had ample information to make a warrantless arrest of defendant.

"Probable cause to make a warrantless arrest exists when police officers have trustworthy information that would lead a prudent person to believe that the suspect has committed a crime."  *United States v. Sherrill*, 27 F.3d 344, 347 (8th Cir. 1194).  "The probable cause standard is a practical, nontechnical conception that deals with the factual and practical considerations of everyday life on which reasonable and prudent [people], not legal technicians, act."  *Maryland v. Pringle*, 540 U.S. 366, 370 (2003) (internal citations and quotations omitted).  "[T]he mere probability or substantial chance of criminal activity, rather than an actual showing of criminal activity, is all that is required."  *United States v. Winarseke*, 715 F.3d 1056, 1067 (8th Cir. 2013).  "The substance of all the definitions of probable cause is a reasonable ground for belief of guilt."  *Brinegar v. United States*, 338 U.S. 160, 176 (1948) (internal citations and quotations omitted).

Based on the physical description of defendant given to Investigator Isley by Mr. Schmitt, the photographs that Investigators Berry and Isley uncovered from defendant's social media, and the officers' prior experience with defendant, Investigator Berry had good reason to be "fairly confident" of defendant's identity before officers made contact

23

with him.  This information—taken together with the timing of defendant's arrival and contemporaneous communication of his arrival to Investigator Berry—constituted significantly more than a hunch that defendant was the person with whom they had been communicating when they seized defendant.  Officers had sufficient information to establish probable cause that defendant was the subject of their investigation into who had distributed heroin to the victim.  Accordingly, officers had sufficient probable cause to arrest defendant and did not violate the Fourth Amendment when they seized him. Defendant's objection on this ground is **overruled**.

### D.     *Seizure of Defendant's Cell Phone*

Almost immediately upon the arrest of defendant, officers seized his cell phone. Judge Roberts found that, under the circumstances, the seizure of defendant's cell phone was reasonable to preserve evidence.  (Doc. 48, at 37).  Defendant objects to this finding and essentially argues that the seizure of the cell phone is the "fruit of the poisonous tree"—that is, because officers' initial seizure of defendant was unreasonable, then the subsequent seizure of defendant's personal effects was also unreasonable.  (Doc. 56, at 6).

Defendant's argument is foreclosed by the Court's finding above. The initial seizure was reasonable under the circumstances, so there is no poisonous tree to bear fruit.  Defendant was seized on probable cause that he was involved in the illicit heroin trade.  That probable cause was based in large part on an investigation that centered on the use of cell phones and telecommunication applications.  Investigator Berry had communicated with defendant about the proposed drug deal only moments before and the cell phone was in defendant's hand when officers arrested him.

Additionally, officers did not immediately search the phone.  Rather, law enforcement secured the phone until a warrant to search the phone could be obtained. This fact supports the conclusion that officers seized the phone as a prophylactic measure

24

to prevent the destruction of evidence until the phone could be legally searched. Due to the high likelihood that evidence of criminal activity was contained in the cell phone, the seizure of defendant's cell phone subsequent to his arrest until a warrant could be obtained was entirely reasonable. *United States v. Stephen,* No. 18-CR-31-CJW, 2018 WL 4839065, at *9 (N.D. Iowa Oct. 4, 2018) (holding that government's temporary retention of USB was justified because it had probable cause to believe USB contained contraband, knew defendant was looking for USB, and could reasonably believe defendant would destroy USB if government returned USB to defendant) (citations omitted). Defendant's objection on this ground is **overruled**.

### E. *Evidence from Defendant's Cell Phone*

Defendant contends that the contents of his cell phone should be suppressed because either 1) the search was a wiretap for which law enforcement should have obtained court authorization, or 2) because the warrant authorizing the search was deficient and the *Leon* good faith exception does not apply. (Doc. 48, at 39). Defendant also moved for a hearing under *Franks v. Delaware*, 438 U.S. 154 (1978). Judge Roberts found that defendant was not entitled to a *Franks* hearing. (Doc. 48, at 40–46). Judge Roberts also found that the warrant was not deficient and if it was, then the *Leon* good faith exception would apply. (*Id.* at 46–50). Defendant objects to each of these findings. (Doc. 56, at 6–9).

#### 1. Franks *Hearing*

First, defendant claims he is entitled to a *Franks* hearing because of misinformation included in the warrant and disputes Judge Roberts' finding that defendant failed to make a preliminary showing sufficient to obtain a *Franks* hearing. (Doc. 56, at 6; Doc. 48, at 46). To be entitled to a *Franks* hearing, a defendant must "make[ ] a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and . . . the

25

allegedly false statement is necessary to the finding of probable cause." *Franks v. Delaware*, 438 U.S. 154, 155–56 (1978).

Showing that an officer inserted a false statement into a warrant intentionally or with reckless disregard for the truth is not a low bar. *United States v. Lucca*, 377 F.3d 927, 931 (8th Cir. 2004). Defendant must do more than make mere allegations of recklessness or deliberate falsehoods. *United States v. Kattaria*, 553 F.3d 1171, 1177 (8th Cir. 2009). Defendant must show "both (1) that the affiant [ ] knowingly and intentionally made false statements or made them in reckless disregard for the truth and (2) if the false information is excised (or the omitted information is included), the affidavit no longer establishes probable cause." *United States v. Daigle*, 947 F.3d 1076, 1083 (8th Cir. 2020) (quoting *United States v. Arnold*, 725 F.3d 896, 898 (8th Cir. 2013) (brackets in original), *reh'g denied* (Mar. 10, 2020)). Absent "a 'strong initial showing' of deliberate falsehood or reckless disregard for the truth," a *Franks* hearing "must be denied." *United States v. Freeman*, 625 F.3d 1049, 1052 (8th Cir. 2010) (quoting *United States v. Pennington*, 287 F.3d 739, 743 (8th Cir. 2002)).

In the search warrant, Investigator Berry swore that Ms. Wilder's boyfriend gave Investigator Isley defendant's name, "Eric Griggs," when instead he had only referred to, "a skinny black male." (Doc. 48, at 42). At the hearing, defense counsel questioned Investigator Berry thoroughly on this matter.

> Q. [Y]ou agree, don't you, that your search warrant addendum indicates that Schmitt identified Ms. Wilder's heroin source by the name Eric Griggs?
>
> A. That's what it says, yes.
>
> Q. But that's not true. He didn't identify the source as a person named Eric Griggs; right?
>
> A. I don't have a clear and concise answer for that, and after reviewing it, I apologize. I mean, I didn't intentionally put that in there. And I don't know why

it ended up in there, and I just -- it's unnecessary. And as far as what I believed was the probable cause for the search of the stuff and again, I apologize for that.

Q. Well, Investigator Isley never told you that [Jeffery] Schmitt said that Ms. Wilder's heroin source was Eric Griggs; right?

A. I don't know that. Like I said before, I'm the case agent on this investigation. I take full responsibility for it. I don't think it was -- it was a misunderstanding between communication between Isley and I, and I don't believe I probably asked enough questions.

Q. Do you work with Investigator Isley for -- well, let me ask you this. How long have you worked with Investigator Isley?

A. I believe during that interview he said he was there for five years at the time of that. And then we worked up – we still work together. . . .

Q. And you don't have any reason to believe that Investigator Isley would have relayed information to you that was untrue; right?

A. No. I think like I -- again, I think it was a miscommunication between us two.

Q. So if [Jeffery] Schmitt hadn't told Investigator Isley Eric Griggs's name, you don't have any reason to think that Investigator Isley would have come to you and said, hey, [Jeffery] Schmitt identified the guy as Eric Griggs; right?

A. I just don't know how that transpired exactly.

Q. Because there's no report regarding that; right?

A. Well, and the fact is, you know, I wrote that—I authored that search warrant, you know, a few days later. So I don't know if some—like our several communications during that time, you know, in that day I misconstrued something he told me or, like I said, I'm not trying to make excuses for why I put that in there. I'm just trying to—I'm trying to understand myself also, and I take full responsibility for it. And I believe that what Investigator Isley put in his report is obviously correct.

27

(Doc. 46, at 41–43). While it is apparent that Investigator Berry erroneously stated in the warrant that Mr. Schmitt identified the victim's heroin dealer by name, it is far from clear that he did so intentionally. Indeed, Investigator Berry seemed fairly forthcoming about his mistake and the government does not contest that there was a mistake.

In light of this testimony and given that there is no evidence in the record to the contrary, the Court agrees with Judge Roberts in finding the officer's testimony credible and reasonable. There is nothing in the record to indicate that Investigator Berry acted maliciously or nefariously here. It is much more plausible to conclude—as Judge Roberts did—that Investigator Berry inadvertently conflated his line of investigation with that of Investigator Isley. (Doc. 48, at 44). This Court finds that the statement was a mistake and not made knowingly or intentionally or with reckless disregard for the truth.

This conclusion is bolstered by the fact that the information was not necessary to establish probable cause—the second requirement for a *Franks* hearing. The Eighth Circuit Court of Appeals recently reiterated this rule, stating the defendant must show that without the misinformation, the affidavit does not establish probable cause. *Daigle*, 947 F.3d at 1084. Judge Roberts helpfully summarized the information included in the affidavit without including the erroneous information:

- Being called to the scene of Ms. Wilder's death and finding Ms. Wilder's cell phone;
- Investigator Isley talking to Mr. Schmitt at the Black Hawk County jail and learning the passcode to Ms. Wilder's phone;
- Mr. Schmitt's belief that Ms. Wilder was actively using heroin [identity of victim's heroin supplier omitted here];
- Finding the messages between Eric Griggs and Ms. Wilder on Ms. Wilder's phone, and including "only a small portion of the text and Facebook messages exchanged between WILDER and GRIGGS beginning on August 28" that he believed showed that Ms. Wilder was obtaining narcotics from Eric Griggs;
- Investigator Berry's belief that Eric Griggs was the last person who saw Ms. Wilder alive;

28

- Large sections of the recorded phone conversations between Mr. Schmitt and Ms. Wilder from August 31 that documented Ms. Wilder's trip to, around, and from Dewar, Iowa to pick up heroin, much of it with her heroin supplier in her car, her arrival back home, and Mr. Schmitt's admonition to Ms. Wilder not to do too much "H" at one time;
- Sections of the text messages he exchanged with Defendant arranging to buy heroin and
- Information about a white Explorer with a passenger who Investigator Isley believed to be Eric Griggs first being observed at the Casey's and then moving to Perkins;
- the investigative stop of the Explorer, including the detainment of Defendant and Mr. Scaturro;
- The seizure of Defendant's and Mr. Scaturro's cell phones, and the contraband found in the Explorer; and
- Investigator Berry's knowledge that people involved in the illegal sale of narcotics arrange drug deals using cell phones and that information in cell phones can help law enforcement expand its investigation into the illegal sale and distribution of narcotics in the Waterloo area.

(Doc. 48, at 45–46).

Defendant alleges that without the erroneous information, law enforcement would have no way of knowing that defendant was the same "Eric Griggs" who supplied the victim with heroin. (Doc. 56, at 8). Even if that were true, it has no bearing on the validity of the warrant. Defendant seems to be implying a burden of certainty on law enforcement officials who apply for warrants. There is, of course, no such burden. Warrants must be based on probable cause that evidence will be found in a specific place and officers are under no obligation to prove their suspicions conclusively. *See Gerstein v. Pugh*, 420 U.S. 103, 121 (1975) (contrasting probable cause with reasonable doubt and preponderance standards). Based solely on what remains after excising the erroneous information, the warrant contains more than enough facts to establish the existence of probable cause to believe that defendant was the victim's heroin supplier and that

evidence of that crime would be found on his phone. Defendant's objection on this ground is **overruled**.

### 2. Leon *Good Faith Exception*

Judge Roberts found that the good faith exception is not applicable here because the search warrant was not deficient. (Doc. 48, at 50). To ensure a thorough analysis in the event his recommendation regarding the warrant was not accepted, however, Judge Roberts fully considered the applicability of the exception and found that the exception would apply here. (*Id.* at 46–50).

Defendant objects to this conclusion on the grounds that the government violated his Fourth Amendment protection during the September 1, 2018 text messages. (Doc. 56, at 8). Defendant also objects asserting that Investigator Berry's conduct was not close enough to the line of validity to make his belief in the validity of the warrant reasonable because he was not a party to the communication. (*Id.* (citation omitted)).

This Court has already concluded above that defendant does not have standing to challenge the use of the victim's cell phone under the Fourth Amendment, that Investigator Berry was a party to the communications, and that law enforcement conduct leading up to the issuance of the search warrant was not objectively unreasonable. The warrant issued in part on the strength of the evidence gathered using the victim's cell phone was valid and properly executed. In the event the Court is mistaken in all of these findings, however, the Court agrees with Judge Roberts' analysis and conclusion that the *Leon* good faith exception applies here.

"Under the good-faith exception, evidence seized pursuant to a search warrant issued by a magistrate that is later determined to be invalid, will not be suppressed if the executing officer's reliance upon the warrant was objectively reasonable." *United States v. Proell*, 485 F.3d 427, 430 (8th Cir. 2007). A "good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have

Case 6:19-cr-02062-CJW-MAR   Document 86   Filed 12/03/20   Page 30 of 41

known that the search was illegal despite the [issuing judge's] authorization." *United States v. Puckett*, 466 F.3d 626, 630 (8th Cir. 2006) (internal quotations and citations omitted)(alteration in original). There are four circumstances in which an officer's reliance on a warrant may be said to be objectively unreasonable: (1) when the affidavit supporting the warrant contained a false statement included knowingly and intentionally or with reckless disregard for the truth, thus misleading the magistrate, (2) when the magistrate issuing the warrant "wholly abandoned his judicial role" in issuing the warrant, (3) "when it is entirely unreasonable to believe that an affidavit provides probable cause to issue a warrant", and (4) when the warrant is "so facially deficient" that no police officer could reasonably interpret the warrant as valid. *Puckett*, 466 F.3d at 630.

The Court has already determined that Investigator Berry did not include erroneous information in the affidavit knowingly and intentionally or with reckless disregard for the truth, disposing of the first circumstance. Further, there is no reason to suspect that the issuing magistrate "wholly abandoned his judicial role" when he issued this warrant. Based on the information included in the affidavit accompanying the warrant request, the issuing judge knew that the victim was a heroin user and died of a heroin overdose, she used her cell phone to facilitate heroin transactions, the person who sold her the heroin which killed her was likely to be included in a conversation stored on her phone, and that the person who sold her the heroin which killed her likely used his phone to facilitate the transaction with the victim. (Doc. 26-1, at 7–17). The affidavit therefore established a sufficient nexus between the illegal activity and defendant's property to be searched.

Critically, the source of the information contained in the affidavit was not just the officer applying for the warrant. The issuing judge had the benefit of the officer's observations, recorded jailhouse phone calls between the victim and her boyfriend, Iowa Department of Transportation records, and independent witness statements. (*Id.*, at 8).

Given the wealth of information from multiple sources included in the affidavit, the issuing judge was justified in relying on it to issue the warrant.

This wealth of information also disposes of the third circumstance, that the affidavit supporting the warrant is "so lacking in indicia of probable cause as to render official belief in its existence *entirely unreasonable*." *Leon*, 468 U.S. at 923 (internal quotation marks and citation omitted). *See also Puckett*, 466 F.3d at 630 (listing the third circumstance as "when it is entirely unreasonable to believe that an affidavit provides probable cause to issue a warrant"). "'Entirely unreasonable' is not a phrase often used by the Supreme Court." *United States v. Carpenter*, 341 F.3d 666 (8th Cir. 2003) (cautioning against the "dilution of the Court's particularly strong choice of words."). As discussed above, the touchstone for the existence of probable cause is "the mere probability" that a crime has been committed. *Winarseke*, 715 F.3d at 1067. An affidavit need not definitively prove defendant's guilt to be valid. Here, both the issuing judge and the Magistrate Judge reviewing the affidavit concluded that the affidavit contained sufficient indicia of probable cause. This Court sees no reason to conclude otherwise and finds that officer's reliance on the warrant was entirely reasonable. This same line of reasoning answers the final question of whether the warrant was "so facially deficient" that no officer could reasonably interpret it as valid. No evidence in the record exists to support a finding that the warrant was facially deficient and the Court declines to find it so now.

Defendant places undue weight on the Eighth Circuit Court of Appeals' holding in *United States v. Conner*, 127 F.3d 663 (8th Cir. 1997). There, without a search warrant and with weapons drawn, officers commanded defendant to open his hotel room door and arrested him. *Id.* at 666. The officers then used facts they observed through the open doorway to obtain a warrant to search the hotel room and the defendant's residence in another town. *Id.* The court held that the officers' actions amounted to an

unreasonable intrusion on defendant's zone of privacy, that the resulting warrant was invalid, and that the *Leon* good faith exception did not apply because the officers' conduct was not "close enough to the line of validity to make the officers' belief in the validity of the warrant objectively reasonable." *Id.* at 666–67. The court goes on to contrast conduct which is close to the line of validity with "conduct which is 'clearly illegal.'" *Id.* at 667 (quoting *United States v. White*, 890 F.2d 1413, 1419 (8th Cir. 1994)).

Here, by arguing that Investigator Berry's conduct is not "close enough to the line of validity," defendant implicitly suggests that the Court should declare Investigator Berry's conduct to be "clearly illegal." The Court declines to do so. The officer's conduct in *Conner* fell outside of well-established Fourth Amendment caselaw. Investigator Berry's conduct here did not and is therefore not "clearly illegal." Defendant's objection on this ground is **overruled**.

### 3. Statements Made at Waterloo Police Department

Defendant initially argued that post-arrest statements he made at the Waterloo Police Department were "the product[s] of an illegal seizure of his person, and thus, are fruits of the poisonous tree requiring suppression." (Doc. 26, at 14). Judge Roberts concluded that statements defendant made during his interview at the Waterloo Police Department should not be suppressed as fruits of the poisonous tree because defendant voluntarily waived his right to remain silent and this waiver was attenuated from the allegedly illegal stop of defendant's vehicle. (Doc. 48, at 54–62). Defendant objects to this finding and argues that (1) officer did not warn defendant of his rights a second time prior to questioning, (2) defendant made statements sufficiently close in time to the allegedly illegal seizure to weigh against attenuation, (3) there are no intervening circumstances which would break the chain of causation between an allegedly illegal arrest and the statements, and (4) the initial seizure was purposefully and flagrantly illegal. (Doc. 56, at 9–11).

33

To determine if the exclusionary rule applies, "[t]he first question is whether there was a sufficient factual nexus between the constitutional violation . . . and the challenged evidence . . .. The second question is whether the attenuation doctrine applies." *United States v. Yorgensen*, 845 F.3d 908, 913–14 (8th Cir. 2017) (quotation marks omitted). Judge Roberts found that there is a sufficient factual nexus between the alleged constitutional violation and the challenged evidence—"but for being in custody, Defendant would not have talked to Investigator Berry." (Doc. 48, at 56). Defendant does not object to this conclusion, and this Court agrees with Judge Roberts that the first prong is satisfied in favor of defendant.

To determine whether the attenuation doctrine applies, the Court must analyze four factors: "the giving of *Miranda* warnings, the 'temporal proximity' of the illegal search and the statements made, the 'presence of intervening circumstances,' and 'the purpose and flagrancy of the official misconduct.'" *United States v. Riesselman*, 646 F.3d 1072, 1080 (8th Cir. 2011) (citation omitted). This Court will address these in order.

### a. Giving of Miranda Warnings

"Providing Miranda warnings is an "important, although not dispositive," factor that weighs against suppression of [defendant's] subsequent statements." *Yorgensen*, 845 F.3d at 914. In his R&R, Judge Roberts succinctly summarized the applicable caselaw as follows:

> The Government bears the burden to prove a waiver of *Miranda* rights by a preponderance of the evidence. *Colorado v. Connelly*, 479 U.S. 157, 168 (1986). To make this determination, courts consider the following personal characteristics of the defendant:
>
> > (1) their age; (2) their general intelligence and education; (3) whether they were intoxicated or under the influence of drugs when consenting; (4) whether they consented after being informed of their right to withhold consent or of their

34

Miranda rights; and (5) whether, because they had been previously arrested, they were aware of the protections afforded to suspected criminals by the legal system.

*Griffith*, 533 F.3d at 984 (quoting *United States v. Bradley*, 234 F.3d 363, 366 (8th Cir. 2000)) (internal citation omitted). The courts consider the following environmental characteristics in which consent to the interview was given:

> [W]hether the person who consented (1) was detained and questioned for a long or short time; (2) was threatened, physically intimidated, or punished by the police; (3) relied upon promises or misrepresentations made by the police; (4) was in custody or under arrest when the consent was given; (5) was in a public or a secluded place; or (6) either objected to the search or stood by silently while the search occurred.

*Id*. (citation omitted & bracket in original). The factors are not applied "mechanically," but only serve as guidance for the court's analysis. *Id*. A valid *Miranda* waiver must be voluntary, knowing, and intelligent. *United States v. Vinton*, 631 F.3d 476, 483 (8th Cir. 2011). A voluntary waiver is the product of "free and deliberate choice rather than intimidation, coercion, or deception." *Id*. (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)). A waiver is knowing and intelligent if it is made "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id*.

When a defendant has been advised of his *Miranda* rights, does not sign a waiver of rights or verbally waive his rights, but proceeds to voluntarily answer questions from law enforcement, he has engaged in a "course of conduct indicating waiver" of his right to remain silent. *Berghuis v. Thompkins*, 560 U.S 370, 386 (2010) (citation omitted); *see also United States v. Washington*, 109 F.3d 459, 465 (8th Cir. 1997) (holding that defendant waived his Sixth Amendment rights by electing to answer officer's questions after being *Mirandized*) (citing *North Carolina v. Butler*, 441 U.S. 369, 373 (1979)); *United States v. Chartier*, No. CR13-0018, 2013 WL 5719483, at *11 (N.D. Iowa Aug. 16, 2013) (holding that defendant waived his right to remain silent by making "knowing, voluntary statements" to police officer after receiving *Miranda* warning), *adopted as*

*modified*, 2013 WL 5719482 (N.D. Iowa Oct. 21, 2013) (this issue not addressed in objections to R. & R.), *aff'd*, 772 F.3d 539 (8th Cir. 2014); *United States v. Wetsch*, Crim. No. 12-0045 SRN/JJG, 2013 WL 1435228, at *29 (D. Minn. Feb. 8, 2013) (holding that defendant waived his right to remain silent by voluntarily speaking to officers, and reasoning that "the Eighth Circuit has regularly held that a custodial defendant's continued responses to question[s] after being advised of his rights constitutes a waiver") (citing *United States v. Binion*, 570 F.3d 1034, 1041 (8th Cir. 2009)), *R. & R. adopted*, 2013 WL 1435210 (D. Minn. Apr. 9, 2013).

(Doc. 48, at 59–61).

This Court agrees with Judge Roberts and finds that defendant voluntarily waived his right to remain silent.  Officers advised defendant of his rights after his arrest and defendant indicated that he understood his rights.  (Gov. Ex. 5, at 1:49).  Officers then brought defendant to the police department an hour later and questioned him; defendant did not invoke his right to remain silent.  In answering the officers' questions after being advised of his right to refuse to answer questions, defendant engaged "in a course of conduct indicating waiver of" this right.  *See Berghuis*, 560 U.S. at 386.

Additionally, this Court finds that defendant waived his rights knowingly and intelligently.  As Judge Roberts notes, defendant was 37 years old at the time of his interview, appeared to be of at least average intelligence, was not intoxicated or under the influence of drugs when consenting, and was aware of the *Miranda* protections, having been convicted of four prior felonies.  *See* (Doc. 48, at 61).  Officers neither threatened nor physically intimidated or punished defendant, did not make promises or misrepresentations, and questioned defendant in a public place.  (*Id.*).

It is true that officers advised defendant of his rights at the scene of the arrest, but did not repeat the *Miranda* warning a second time prior to questioning.

36

A second warning would have strengthened the government's argument of voluntariness significantly, but the absence is far from fatal to the issue. *Rawlings v. Kentucky*, 448 U.S. 98, 107 (1980) (stating that the issuance of a *Miranda* warning is an "important, although not dispositive" factor). Although the fact that officers did not re-*Mirandized* defendant before questioning him at the police station, and defendant never signed a waiver form, does carry some weight (*see* Doc. 56, at 11), those facts are not dispositive of the issue. Because this Court finds that defendant voluntarily, knowingly, and intelligently waived his right to remain silent, this factor weighs in favor of finding the evidence sufficiently attenuated from the alleged violation.

### b. Temporal Proximity

Because the first factor is not dispositive, the Court next evaluates the temporal proximity between the alleged unlawful arrest and the questioning at the police department. Here, defendant states that an hour had passed from the arrest to questioning. (Doc. 56, at 10). Using the free will analysis described in *United States v. Palacios-Suarez*, 149 F.3d 770, 772-73 (8th Cir. 1998), Judge Roberts found that this factor weighs in favor of attenuation. (Doc. 48, at 57). This Court respectfully disagrees with Judge Roberts' conclusion. While a free will analysis may be appropriate in other circumstances where defendant's conduct is in question, the attenuation doctrine requires the Court to focus on the government's conduct. *See Utah v. Strieff*, 136 S. Ct. 2056, 2061 (2016) ("[t]he attenuation doctrine evaluates the causal link between the government's unlawful act and the discovery of evidence, which often has nothing to do with a defendant's actions."). In finding the couple minutes in between the arrest and questioning did not favor attenuation, the Court in *Strieff* emphasized that they were "relying in part on the 'less than two hours' that separated the unconstitutional arrest and the confession."

Case 6:19-cr-02062-CJW-MAR   Document 86   Filed 12/03/20   Page 37 of 41

*Id.* at 2062. The one hour that elapsed here falls into the "less than two hours" category and thus this Court finds this factor weighs against attenuation.

The Supreme Court also balances the time interval with "the precise conditions" under which the defendant was detained in the time between the arrest and confession. *Rawlings*, 448 U.S. at 107 (noting "the congenial atmosphere existing during the forty-five minute interval" where the defendants were able to move freely about were distinct from being "under the strictest of custodial conditions" (citation omitted)). Here, the conditions between the time of the arrest and the questioning, where defendant was detained and then rode handcuffed in the back of the police car to the precinct, were likely more similar to strict custodial conditions than to a congenial atmosphere. Thus, the conditions do not offset the short time period, and weigh against attenuation.

### c. Intervening Circumstances

Next, this Court analyzes whether intervening circumstances occurred to purge the taint of any constitutional violation. Judge Roberts found that such intervening circumstances had occurred. (Doc. 48, at 58). This Court respectfully disagrees with this finding.

In analyzing this factor, changing locations is significant in favoring attenuation. *See Riesselman*, 646 F.3d at 1080 (finding a change of location from outside to indoors was significant intervening circumstance); *United States v. Vega-Rico*, 417 F.3d 976, 980 (8th Cir. 2005) (finding that interviewing suspect four days after alleged violation and in a different city was significant). Here, defendant was moved from the Perkins parking lot where the arrest occurred to a police station ten minutes away. Following the holding in *Riesselman*, this change of location is a significant intervening event.

38

The Eighth Circuit Court of Appeals has also found it significant when the interviewer is an officer from a different agency than the one who had allegedly violated defendant's Fourth Amendment rights. *Yorgensen*, 845 F.3d at 914 ("[defendant] spoke with an 'agent from a separate law enforcement agency, and neither agent nor agency had any involvement in the initial Fourth Amendment violation.'" (citation omitted)); *Riesselman*, 646 F.3d at 1081–82; *Vega-Rico*, 417 F.3d at 980. Here, defendant stated he was interviewed by two officers, one of whom was the arresting officer, and both of whom were from the same agency. Thus, this does not weigh in favor of finding an intervening circumstance.[2] Besides moving defendant to a new location, there were no other significant intervening circumstances that would weigh in favor of attenuation. *See Strieff*, 136 S. Ct. at 2062 (discovering the suspect had an outstanding warrant "entirely unconnected with the stop" was an intervening circumstance); *Segura v. United States*, 468 U.S. 796 (1984) (obtaining warrant "wholly unconnected with the illegal entry" was an intervening circumstance). In the context of the arrest overall, the transportation of defendant from the scene of the arrest to the police station is more accurately described as the next logical step in his arrest rather than an intervening circumstance which would ameliorate the damage done by the alleged constitutional violation. Thus, this factor weighs against attenuation.

### d. *Purpose and Flagrancy of the Official Misconduct*

Judge Roberts found there was no flagrant violation in effecting the stop and thus this factor weighs in favor of attenuation. (Doc. 48, at 59). Judge Roberts accurately summarized the controlling caselaw as follows:

---

[2] Judge Roberts also cites the *Riesselman* court's analysis that the manner of the questioning is consequential, which in turn cited *Rawlings*. This analysis was misplaced, however, as the *Rawlings* court was discussing the "congenial atmosphere" in relation to the temporal proximity analysis, not the intervening factors analysis.

The Supreme Court places a particular emphasis on any 'purpose and flagrancy of the official misconduct' in effecting the initial illegal entry." [*United States v.*] *Brandwein*, 796 F.3d [980,] 985 [(8th Cir. 2015)], quoting *Brown* [*v. Illinois*], 422 U.S. [590], 603–04 [1975]. "Application of the exclusionary rule . . . does not serve [its] deterrent function when the police action, although erroneous, was not undertaken in an effort to benefit the police at the expense of the suspect's protected rights." *United States v. Simpson*, 439 F.3d 490, 496 (8th Cir. 2006) (quotation omitted). "An unreasonable mistake alone is not sufficient to establish flagrant misconduct." *United States v. Herrera–Gonzalez*, 474 F.3d 1105, 1113 (8th Cir. 2007); *see Strieff*, 136 S.Ct. at 2063.

(*Id.*, at 58) (quoting *Yorgensen*, 845 F.3d at 915).

Defendant argues that the seizure was purposeful and was intended to investigate and question him regarding the death of Ms. Wilder. (Doc. 56, at 10). The Court agrees that this was the purpose of the stop. As discussed above, however, the officers had probable cause to conduct the stop, arrest defendant, and subsequently search Mr. Scaturro's vehicle. Further, there was no flagrant official misconduct. The stop "was not undertaken in an effort to benefit the police at the expense of the" defendant's rights as described in *Yorgensen*. From the very beginning, the officers' intent was to arrest defendant. Indeed, the entire purpose of the ruse was to attract the person police believed to be responsible for the victim's death to a known location so they could arrest that person. There was nothing unreasonable about placing defendant in a squad car while officers conducted the search and it was certainly not a mistake. The fact that defendant was subsequently released is of no moment. Thus, this factor weighs in favor of attenuation.

Two of the four factors weigh in favor of attenuation, the last of which holds the most weight, and thus this Court finds that the exclusionary rule does not apply here. Defendant's objection on this ground is **denied**.

40

## V.    CONCLUSION

For the reasons stated above, the defendant's objection No. 1 is **sustained** and objections Nos. 2–11 ar**e overruled**. (Doc. 56).   The Court **adopts with minor modifications** Judge Roberts' Report and Recommendation (Doc. 48) and **denies** defendant's Motion to Suppress (Doc. 25).

**IT IS SO ORDERED** this 3rd day of December, 2020.

_____
C.J. Williams
United States District Judge
Northern District of Iowa

Case 6:19-cr-02062-CJW-MAR   Document 86   Filed 12/03/20   Page 41 of 41